UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| IRON WORKERS DISTRICT COUNCIL, SOUTHERN OHIO & VICINITY PENSION TRUST, Derivatively on Behalf of BOSTON SCIENTIFIC CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>J. RAYMOND ELLIOTT, JAMES R. TOBIN, SAMUEL R. LENO, JOHN E. ABELE, KATHARINE T. BARTLETT, NELDA J. CONNORS, MARYE ANNE FOX, RAY J. GROVES, ERNEST MARIO, PETE M. NICHOLAS, N.J. NICHOLAS, JR., UWE E. REINHARDT and JOHN E. SUNUNU,<br><br>Defendants,<br><br>– and –<br><br>BOSTON SCIENTIFIC CORPORATION, a Delaware corporation,<br><br>Nominal Party. | Civil Action No. _____<br><br>DEMAND FOR JURY TRIAL |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT

BOUCHARD MARGULES & FRIEDLANDER, P.A.
Joel Friedlander (Bar No. 3163)
Sean M. Brennecke (Bar No. 4686)
222 Delaware Avenue, Suite 1400
Wilmington, DE  19801
(302) 573-3500
jfriedlander@bmf-law.com
sbrennecke@bmf-law.com

ROBBINS GELLER RUDMAN & DOWD LLP
Darren J. Robbins
Travis E. Downs III
Brian O. O'Mara
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058

AUGUST 19, 2010

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action on behalf of nominal party Boston Scientific Corporation ("BSX" or the "Company") against its entire Board of Directors (the "Board") and certain current and/or former top officers, arising from defendants' unlawful course of conduct during the period from April 20, 2009 to March 30, 2010 (the "Relevant Period"), seeking to remedy defendants' breaches of fiduciary duties of candor, good faith and loyalty.

2.     BSX is a worldwide developer, manufacturer and marketer of medical devices, including products that focus on the treatment of cardiac arrhythmias and heart failure.  Most of BSX's Cardiac Rhythm Management ("CRM") products are implantable cardiac defibrillator ("ICD") systems used to detect and treat abnormally fast heart rhythms (tachycardia).  These include implantable cardiac resynchronization therapy defibrillator ("CRT-D") systems used to treat heart failure, and implantable pacemaker systems used to manage slow or irregular heart rhythms (bradycardia).  BSX's entry into the CRM market resulted primarily from its 2006 acquisition of Guidant Corp. ("Guidant").

3.     ICD systems are far and away the largest contributor to the Company's CRM sales, accounting for approximately 70% of that segment's sales in each of the years since BSX acquired Guidant.  Sales of ICDs and other CRM products were disappointing after the acquisition, leading BSX to record a $2.6 billion goodwill impairment charge during the fourth quarter of 2008.  As explained in BSX's 2008 Report on Form 10-K, "[a]t the time of the Guidant acquisition in 2006, we expected average U.S. net sales growth rates in the mid-teens. . . .  [W]e now expect average U.S. net sales growth in the mid to high single digits."

4.     Following the acquisition, defendants claimed that BSX's CRM business had stabilized and was poised for growth with the introduction of new products, including the

COGNIS and TELIGEN line of ICD devices.  Accepting defendants' claims that the Company had finally turned the corner, Moody's Investors Service, Standard & Poor's Rating Services and Fitch all raised their ratings on BSX securities in early 2009.  In each of its first two quarters of 2009, defendants reported that BSX's domestic CRM business had returned to double-digit growth, reporting 10% growth in 1Q09 and 11% growth in 2Q09.  On the heels of this news, CEO James R. Tobin ("Tobin"), who had engineered (and been roundly criticized for) the Guidant acquisition, announced his retirement.  Tobin was succeeded by BSX Board member J. Raymond Elliott ("Elliott"), the former head of Zimmer Holdings.

5.     When BSX's third quarter results were reported on October 19, 2009, defendants announced a surprising reversal in the Company's CRM sales trend, reporting a paltry 7% growth in domestic sales, which it attributed to declining demand for its products and disappointing results from newly hired sales staff.  The value of BSX common stock declined 15% on this news, causing a one-day loss of more than $2.4 billion in market capitalization.  In fact, the decline in demand was due to the fact that defendants, under pressure from government regulators, had begun to put a stop to certain illegal and unethical business practices that BSX's sales force had been using to increase CRM sales and reverse the trends that had led to the enormous write-downs at the end of 2008, including the use of impermissible charitable contributions and other financial inducements that violate the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b, the False Claims Act, 31 U.S.C. §3729-3733, or other federal healthcare program requirements.

6.     On November 4, 2009, BSX filed a Report on Form 8-K disclosing without comment that William McConnell Jr., its senior CRM sales and marketing executive, planned to retire at the end of the year.  The 59-year-old McConnell had worked for Guidant

at the time of BSX's Guidant acquisition, and before that was a managing partner for Arthur Andersen LLP's consulting arm in Indianapolis, where Guidant was headquartered. On November 6, 2009, buried in BSX's 3Q09 Report on Form 10-Q, was a brief mention that BSX had received a subpoena from the U.S. Department of Health and Human Services requesting "certain information relating to contributions made by CRM to charities with ties to physicians or their families."

7.      The import of these announcements was not revealed until February 10, 2010, when defendants reported BSX's full year results and lowered the Company's financial guidance, explaining that BSX was expected to *lose up to $100 million in CRM sales* due to the departure of a number of CRM sales personnel in the wake of "recent disciplinary action" taken against them by the Company. On this news, $1.2 billion in market capitalization was wiped out as BSX's common shares fell nearly 10%. As a Credit Suisse analyst remarked in a report issued after the earnings conference call: "*[T]he company gained share in 2009 however it now appears that such share gains may have been helped by questionable sales practices*."

8.      Less than a year removed from the last restructuring of the Company's CRM business, defendants were forced to announce that BSX was again restructuring and had made numerous management changes in another attempt to restore profitability to the business. Weeks later, an exhibit to BSX's 2009 Report on Form 10-K, filed February 26, 2010, would reveal that many of these changes were required by a Corporate Integrity Agreement BSX had signed with the Office of Inspector General of the U.S. Department of Health and Human Services ("HHS") to prevent defendants' continued use of charitable contributions or other illegal inducements to boost CRM sales.

9.     On the same day its 2009 financial results were released, BSX was attempting to dismiss a negative report in the respected medical journal, *HeartRhythm*, regarding a weakened header bond in one of its COGNIS CRT-D ICD devices that had caused a patient to receive repeated unnecessary shocks to the heart within hours of the device being implanted.[1]  Defendant Elliott reacted angrily to the report, causing BSX to issue a press release on February 10, 2010 – the day after the article was published – that accused the journal of rushing to judgment before talking to the Company or receiving a detailed engineering analysis of the device failure – charges later denied by the article's authors.  On the Company's 4Q09 investor conference call, held February 11, 2010, Elliott claimed that the incident was caused by a competitor's product, not BSX's device.  Nevertheless, defendants acknowledged that BSX was aware of two other incidents involving a weakened header on the product, had warned doctors of the problem the previous December, and had already "implemented manufacturing process improvements to strengthen the header bond."

10.     On March 15, 2010, BSX suffered another blow when defendants unexpectedly announced, before the market opened, that the Company was suspending all sales of its ICD devices because defendants had failed to notify regulators of changes in how the devices were manufactured.  Defendants revealed that BSX had stopped shipments of the implants and was recalling all of its previously shipped inventory.  In a press release issued that day, defendants said that they were aware of at least two instances in which "manufacturing process changes were not submitted for [FDA] approval."  The process

---

[1]     This led to multiple episodes of "inappropriate anti-tachycardia pacing," or inappropriate ATP.  ATP refers to shocks delivered to the heart that are intended to increase the pace of the heartbeat in an attempt to break a cycle of tachycardia before it can lead to ventricular fibrillation and sudden cardiac death.  ATP is also referred to as "fast pacing" or "overdrive pacing."

changes affected virtually all of BSX's ICD product families, including the COGNIS product that was the subject of the *HeartRhythm* article.

11.     Following these revelations, another $1.5 billion in market value was eliminated from BSX's market capitalization.

12.     Defendants' misconduct has caused significant harm to this once valuable franchise and has subjected the Company to significant potential liability for violation of state and federal laws.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(1) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this district, or is an individual who has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by the district courts of this district permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because BSX is a Delaware corporation.

## PARTIES

17.     Plaintiff Iron Workers District Council, Southern Ohio & Vicinity Pension Trust is, and at all times relevant hereto was, a BSX shareholder.  Plaintiff is a citizen of the state of Ohio.

18.     Nominal defendant BSX is a Delaware corporation.  Its corporate offices are located in Natick, Massachusetts.  BSX develops, manufactures and markets medical devices used in a broad range of interventional medical specialties.

19.     Defendant J. Raymond Elliott ("Elliott") was a BSX director from September 2007 through June 2009.  Thereafter, and beginning on July 13, 2009, Elliott became the President and CEO of BSX.  On information and belief, Elliott is the former Chairman, President and CEO of Zimmer Holdings, Inc.  BSX paid defendant Elliott the following compensation as an executive and a director:

| Year | Salary | Bonus | Stock Awards | Option Award | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation |
|------|--------|-------|--------------|--------------|----------------------------------------|-------------------------|------------------------|
| 2009 | $598,356 | $1,500,000 | $14,164,400 | $15,232,000 | $607,766 | $102,276 | $1,267,936 |

Elliott is a resident of Massachusetts.

20.     Defendant James R. Tobin ("Tobin") was the President, CEO and a director of BSX from 1999 until July 13, 2009.  From July 13, 2009 through November 30, 2009, Tobin remained employed as a Senior Advisor to the Company.  BSX paid defendant Tobin the following compensation as an executive and a director:

| Year | Salary | Bonus | Option Award | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation |
|------|--------|-------|--------------|----------------------------------------|-------------------------|------------------------|
| 2009 | $909,588 | $1,499,572 | $7,460,000 | $985,455 | $190,518 | $2,660,698 |

Tobin is a resident of Massachusetts.

21.     Defendant Samuel R. Leno ("Leno") was Executive Vice President, Financial and Information Systems, and Chief Financial Officer of BSX from June 2007 until he was promoted to Executive Vice President and Chief Operating Officer on March 1, 2010.  As the Company's CFO and principal accounting and financial officer, Leno was responsible for evaluating the effectiveness of disclosure controls and procedures for preparing and filing

BSX's financial results with the U.S. Securities and Exchange Commission ("SEC"). Leno controlled, reviewed, authorized, and certified the contents of the Company's financial statements, press releases and Form 10-K issued during the Relevant Period. BSX paid defendant Leno the following compensation as an executive:

| Year | Salary | Stock Awards | Option Award | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation |
|------|--------|--------------|--------------|----------------------------------------|-------------------------|------------------------|
| 2009 | $625,000 | $250,000 | $750,000 | $420,938 | $127,907 | $95,877 |

Leno is a resident of Massachusetts.

22.     Defendant John E. Abele ("Abele") has been a director of BSX since 1979. BSX paid defendant Abele the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2009 | $75,000 | $125,000 | $1,176,937 | $1,376,937 |

Abele is a resident of Florida.

23.     Defendant Katharine T. Bartlett ("Bartlett") has been a director of BSX since August 2009. She is a member of the Executive Compensation and Human Resources Committee. BSX paid defendant Bartlett the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2009 | $36,889 | $125,000 | $161,889 |

Bartlett is a resident of North Carolina.

24.     Defendant Nelda J. Connors ("Connors") has been a director of BSX since December 2009. She is a member of the Compliance and Quality Committee. BSX paid defendant Connors the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Non-Qualified Deferred Compensation Earnings | Total |
|------|-------------------|--------------|----------------------------------------------|-------|
| 2009 | $3,465 | $125,000 | $34 | $128,690 |

Connors is a resident of Illinois.

25.     Defendant Marye Anne Fox ("Fox") has been a director of BSX since 2001. She is a member of the Compliance and Quality Committee.  BSX paid defendant Fox the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Non-Qualified Deferred Compensation Earnings | Total |
|------|------|------|------|------|
| 2009 | $75,000 | $125,000 | $1,407 | $209,238 |

Fox is a resident of California.

26.     Defendant Ray J. Groves ("Groves") has been a director of BSX since 1999. Groves is the Chairman of the Nominating and Governance Committee and is a member of the Executive Compensation and Human Resources Committee.  BSX paid defendant Groves the following compensation as director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2009 | $95,000 | $125,000 | $220,000 |

Groves is a resident of New York.

27.     Defendant Ernest Mario ("Mario") has been a director of BSX since 2001. Mario is the Chairman of the Compliance and Quality Committee and a member of the Executive Compensation and Human Resources and Audit Committees.  BSX paid defendant Mario the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2009 | $95,000 | $125,000 | $220,000 |

Mario is a resident of Pennsylvania.

28.     Defendant Pete M. Nicholas ("P. Nicholas") has been Chairman of the Board of BSX since 1995 and a director since 1979.  P. Nicholas is the brother of defendant N.J.

Nicholas, Jr., one of the Company's directors.   BSX paid defendant P. Nicholas the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2009 | $210,000 | $125,000 | $1,296,141 | $1,631,141 |

P. Nicholas is a resident of Massachusetts.

29.    Defendant N.J. Nicholas, Jr. ("N.J. Nicholas") has been a director of BSX since 1994. He is the Chairman of the Finance Committee. N.J. Nicholas is the brother of P. Nicholas, Chairman of the Board.   BSX paid defendant N.J. Nicholas the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2009 | $78,587 | $125,000 | $203,587 |

N.J. Nicholas is a resident of New York.

30.    Defendant Uwe E. Reinhardt ("Reinhardt") has been a director of BSX since 2002.   Reinhardt is the Chairman of the Audit Committee, and is a member of the Nominating and Governance and Compliance and Quality Committees.   BSX paid defendant Reinhardt the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2009 | $88,132 | $125,000 | $213,132 |

Reinhardt is a resident of New Jersey.

31.    Defendant John E. Sununu ("Sununu") has been a director of BSX since April 2009. Sununu is a member of the Compliance and Quality and Nominating and Governance Committees.   BSX paid defendant Sununu the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2009 | $56,250 | $250,000 | $306,250 |

Sununu is a resident of Virginia.

32.    The defendants identified in ¶¶19-31 herein are referred to as the "Individual Defendants." The defendants identified in ¶¶19 and 22-31 are referred to as the "Current Director Defendants."

33.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BSX's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was regularly provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## DUTIES OF THE BSX DIRECTORS AND OFFICERS

34.    Each BSX director and officer owed BSX and its public shareholders the duty to exercise the highest degree of candor, good faith and loyalty in the management and administration of the Company's affairs, as well as in the use and preservation of its property and assets. As the Delaware Chancery Court explained: "Loyalty. Good faith. Independence. Candor. These are words pregnant with obligation. The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or

formalistic candor." *In re Tyson Foods, Inc. Consol. S'holder Litig.*, No. 1106-CC, 2007 Del. Ch. LEXIS 120, at *10-*11 (Del. Ch. Aug. 15, 2007).

35.     The conduct of BSX's directors and officers complained of herein involves a knowing and culpable violation of their fiduciary obligations, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which the directors and officers were aware, or should have been aware, posed a risk of serious injury to the Company. The illegal conduct of BSX's directors and officers has been ratified by BSX's Board, which has failed to take any action against them, despite knowledge of such actions, an obligation to take action, and demands that proper remedial and preventative action be taken.

36.     To discharge their fiduciary duties of candor, good faith and loyalty, BSX's directors and officers were required, among other things, to:

(a)     in good faith, manage, conduct, supervise and direct the business and affairs of BSX and its subsidiaries in accordance with the applicable laws, and the charter and by-laws of BSX;

(b)     neither violate nor knowingly permit any director, officer or employee of BSX and its subsidiaries to violate applicable federal or state laws, rules and regulations or any rule or regulation of BSX;

(c)     remain informed as to the status of BSX's operations, and upon receipt of notice or information of imprudent, improper, unsound or unlawful practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or stop such practices; and

(d)     ensure that BSX was operated in a diligent, honest and prudent manner in compliance with all applicable federal and state laws, rules and regulations.

37.     By reason of their corporate positions and their ability to control the business and corporate affairs of BSX, defendants were required to use their ability to control BSX in a fair, just and equitable manner, as well as to act in furtherance of the best interests of BSX and its stockholders and not in furtherance of their own personal interests or ideology.  In violation of their fiduciary duties, defendants caused BSX to conduct its business in an unsafe, imprudent, dangerous and illegal manner.

### BACKGROUND TO DEFENDANTS' IMPROPER CONDUCT

38.     On December 5, 2005, BSX announced it was attempting to acquire Guidant. Thereafter, on January 8, 2006, the Company made a definitive offer to consummate the acquisition in a cash and stock transaction valued at $25 billion.  In a press release issued that day, BSX told its shareholders that combined company "sales are expected to grow at a double-digit rate achieving $16 billion in sales in 2011.  Adjusted EPS is expected to be between $1.50 and $1.66 in 2007 and $1.98 and $2.18 in 2008."  The announcement sparked a short but intense bidding war with rival device maker Johnson & Johnson for control of Guidant, causing BSX to increase the value of the offer to $27 billion.  BSX's acquisition of Guidant closed on April 21, 2006.  As explained by defendant P. Nicholas in a press release issued that day, "'[t]his is a momentous day for the employees and stockholders of the new Boston Scientific.'"

39.     Unfortunately, the acquisition did not turn out as planned, and BSX was immediately hit with an FDA warning letter citing serious regulatory problems affecting manufacturing quality systems and record-keeping procedures at three Guidant CRM manufacturing facilities.  Just months after the acquisition was completed, BSX was forced to issue recalls and warnings on almost 50,000 Guidant cardiac devices, leading to a surprise profit warning in September 2006 that sent shares plummeting.  The recalls affected the

market's confidence in the quality of Guidant CRM products, reducing demand, and leading to numerous lawsuits that cost the Company millions of dollars in settlements and legal fees. On October 16, 2006, *Fortune* magazine proclaimed the acquisition "***The (Second) Worst Deal Ever . . . the biggest M&A blunder since AOL/Time Warner***." By the end of 2006, the price of BSX common stock had fallen to $17 from a high of $27 when it first revealed its plans to acquire Guidant.

40.     BSX never realized the lofty expectations it set when it announced its bid to acquire Guidant.  Adjusted EPS were just $0.77 for 2007 and $0.81 for 2008.  By the end of 2007, the price of BSX stock had dropped to $11.66 per share.  The anticipated double-digit growth never materialized, as BSX reported net sales of $8.4 billion in 2007, which dropped to $8.1 billion in 2008.  At the end of 2008, following the $2.6 billion write-down of goodwill associated with the Guidant acquisition, BSX's common stock was trading at just $7.74 per share.

41.     As a result of the foregoing events, at the outset of the Relevant Period, BSX had suffered enormous harm to its reputation, both among shareholders and members of the medical community and their patients.  It was therefore critical that the Company restore its reputation by demonstrating the safety and reliability of its CRM products and its ability to grow revenues based on legitimate demand for those products.  Investors were highly attuned to these conditions, such that BSX's statements about the safety and reliability of its CRM products, the sales and demand for those products, and the Company's sales and business practices and ethics were all highly material to investors.

42.     When BSX reported positive 4Q08 and FY08 results on January 28, 2009, it appeared that the Company had finally turned the corner.  The Company's earnings release boasted that it had achieved its third consecutive quarter of double-digit sales grown in its

domestic CRM business.  Despite the announcement of a $2.7 billion write-down of goodwill associated with the Guidant acquisition that day, defendant Tobin claimed in the earnings release that he remained bullish on the business:

> "This write-down in no way diminishes our confidence in our CRM business," said Tobin.  "**CRM is growing, it is taking market share, and it will be a key driver of the Company's sales and earnings growth going forward**."

43.     Tobin echoed this sentiment on a conference call with investors the following day, January 29, 2009:

> As Sam [Leno] detailed, we delivered steady overall growth in Q4 CRM sales, due mainly to strong US defib sales on the heels of our COGNIS and TELIGEN launches. Q4 marked the third consecutive quarter of double-digit sales growth in our US CRM business.  We've pulled back into a virtual – pulled into a virtual tie with St. Jude in the US and we expect to continue our comeback based on new product momentum.  For the full year, we achieved the highest worldwide defib revenue since 2004, while improving our overall market share position by over 500 basis points.  At this time last year, I said that success in CRM in 2008 would depend largely on our ability to leverage our quality improvements, execute on our product launches, and lead with our latitude strategy.  **I'm pleased to be able to say we achieved all of these goals and we begin 2009 with our CRM business in a much stronger position.**

44.     Spurred by these positive but false projections, both Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Services ("S&P") raised their ratings on BSX, a significant development for the highly leveraged Company.  On March 12, 2009, BSX announced that Moody's had raised the Company's rating outlook to stable from negative, upgraded the Company's U.S. public bond rating to Ba1 from Ba2 and its liquidity rating to SGL-2 from SGL-3, while affirming its corporate credit rating at Ba1, based in part on the Company's "generally steady market share" for CRM products.  On March 25, 2009, BSX announced that S&P had raised the Company's rating outlook to positive from negative and affirmed the Company's corporate credit rating at BB+, again based in part on "prospects for (at a minimum) modest growth in cardiac rhythm management devices given

recent, new product launches." "'We are pleased with the outlook upgrades by both Standard and Poor's and Moody's, which acknowledge the strengthening of our financial fundamentals, the improvements in our businesses, as well as the prospects and the progress we are making in driving profitable sales growth,'" Leno was quoted as saying in the March 25, 2009 press release. "'We will continue to focus on strengthening our profit margins, free cash flow, debt repayment and financial discipline.'"

## DEFENDANTS' UNLAWFUL AND HARMFUL CONDUCT

45.     Between April 20, 2009 and March 30, 2010, defendants engaged in an unlawful course of conduct that misrepresented the Company's business practices, the amount and source of its revenues, the reliability of its products, its compliance with legal and regulatory requirements, the risks to its present and future operations, and the Company's past performance and prospects for future success. When defendants' improper and wrongful conduct, or the economic consequences thereof, was revealed and became apparent to the market, BSX suffered severely as the Company lost approximately $6.7 billion in market capitalization.

46.     On April 20, 2009, BSX issued a press release, which was reviewed and approved by the Board, entitled "Boston Scientific Announces Results for First Quarter Ended March 31, 2009," which included the following statements:

**First Quarter Highlights (Sales growth rates are constant currency):**

- Achieved sales of $2.010 billion and adjusted EPS of $0.19, both in line with guidance (GAAP loss per share of $0.01)

- ***Increased worldwide sales of cardiac rhythm management (CRM) products nine percent, including a 13 percent increase in implantable cardioverter defibrillator (ICD) sales***

- ***Increased U.S. CRM sales 11 percent, including a 14 percent increase in ICD sales, the fourth consecutive quarter of double-digit U.S. CRM growth***

- 15 -

- Expanded worldwide drug-eluting stent (DES) leadership to 44 percent market share; increased U.S. market share to 50 percent: 27 percent TAXUS®, 23 percent PROMUS®

- Successfully launched the next-generation TAXUS® Liberté® Paclitaxel-Eluting Coronary Stent System in Japan, achieved 54 percent market share

- Increased worldwide Endoscopy sales six percent, Urology/Gynecology seven percent and Neuromodulation nine percent

- Received rating outlook upgrades from Moody's and Standard and Poor's

"*We're off to a good start on the year with four percent sales growth*, excluding divestitures, on a constant currency basis and adjusted EPS at the high end of our guidance range," said Jim Tobin, President and Chief Executive Officer of Boston Scientific. "*Our CRM and DES results were particularly impressive, with double-digit U.S. growth in both businesses*. We also saw continued solid performances by our Endoscopy, Urology/Gynecology and Neuromodulation businesses. We further reduced risk by settling additional litigation, pre-paying debt, amending our credit facility, and maintaining financial discipline and strong cash flow."

\*     \*     \*

**Guidance for Second Quarter and Full Year 2009**

The Company estimates net sales for the second quarter of 2009 of between $1.960 billion and $2.080 billion, which includes an estimated $100 million negative impact from foreign currency exchange as compared to the second quarter of 2008. Excluding the impact of foreign currency and sales from divested businesses, the Company estimates net sales growth rates of three percent to nine percent during the second quarter of 2009. Adjusted earnings, excluding acquisition-, divestiture-, litigation- and restructuring-related charges; and amortization expense, are estimated to range between $0.16 and $0.21 per share. The Company estimates net income on a GAAP basis of between $0.07 and $0.13 per share.

The Company reaffirms its net sales estimate for the full year of 2009 of between $8.0 billion and $8.5 billion. The Company also continues to expect adjusted earnings, excluding acquisition-, divestiture-, litigation- and restructuring-related charges; discrete tax items, and amortization expense, for the full year of between $0.80 and $0.90 per share. The Company now expects net income on a GAAP basis of between $0.46 and $0.57 per share, as a result of first quarter litigation-related charges and discrete tax items.

> "*This guidance reflects our optimism about the growth potential of all our businesses, which are benefiting from our renewed focus on product development and increasing sales profitably*," said Tobin. "Our momentum is building, and we are particularly enthusiastic about our prospects for the second half of the year, which we believe will contribute to a very strong 2009."

47.     On May 19, 2009, BSX issued a press release, which was reviewed and approved by the Board, entitled "Fitch Raises Boston Scientific's Rating Outlook to Positive," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.  The release included the following statements:

> Boston Scientific Corporation today announced that Fitch Ratings has raised the Company's rating outlook to positive from stable, while affirming the Company's corporate credit rating at BB+.
>
> Fitch said the revised rating outlook reflects:
>
> - The success the Company has had in stabilizing its drug-eluting stent (DES) business and *returning its cardiac rhythm management (CRM) business to growth, which has included the launch of a number of new DES and CRM products*.  Fitch noted that the Company's other businesses have been performing well.
>
> - The Company's restructuring program, which is nearly completed and is expected to provide a lower cost structure going forward.
>
> - The Company's paying down approximately $1.3 billion in debt during the last four quarters.
>
> - The Company's research and development efforts, which are expected to provide a relatively steady stream of new product introductions across Boston Scientific's entire business.
>
> "*The Fitch upgrade is further testimony to the progress we are making in strengthening our financial fundamentals and driving profitable sales growth*," said Sam Leno, Executive Vice President and Chief Financial Officer of Boston Scientific.  "It comes as additional welcome news after the March upgrades from Moody's and Standard and Poor's. We will continue working to improve our profit margins, free cash flow, debt repayment and financial discipline."

48.     On June 25, 2009, BSX announced the retirement of Tobin and the appointment of Elliott as the Company's new President and CEO.  As a result of his

- 17 -

retirement, Tobin received a cash payment of $2.5 million and the Company accelerated the vesting of 2,000,000 non-qualified stock options that had been awarded to him on February 26, 2009, at a strike price of $8.30 subject to a four-year vesting schedule.  BSX common stock was trading at $10 per share on the date of the announcement.

49.   On July 20, 2009, BSX issued a press release, which was reviewed and approved by the Board, entitled "Boston Scientific Announces Results for Second Quarter Ended June 30, 2009," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.  The release included the following statements:

> Boston Scientific Corporation today announced financial results for the second quarter ended June 30, 2009, as well as guidance for net sales and earnings per share (EPS) for the third quarter and full year 2009.
>
> **Second quarter highlights (Sales growth rates are constant currency):**
>
> - Increased sales seven percent to $2.074 billion and achieved adjusted EPS of $0.20, both at the high end of the Company's guidance range (GAAP EPS of $0.10)
>
> - ***Increased worldwide sales of cardiac rhythm management (CRM) products 10 percent, including a 13 percent increase in implantable cardioverter defibrillator (ICD) sales***
>
> - Increased worldwide sales of drug-eluting stent (DES) systems 14 percent
>
> - Maintained leadership position in worldwide DES market, including a 50 percent share of the U.S. market
>
> - Increased worldwide Neuromodulation sales 18 percent
>
> - Increased worldwide Endoscopy sales six percent, Urology/Gynecology seven percent
>
> "I am excited about joining the Boston Scientific team and to help report a very good quarter," said Ray Elliott, President and Chief Executive Officer of Boston Scientific.  "We delivered sales and earnings at the high end of our guidance range with almost all businesses and regions reporting solid results.  ***The performance of our two largest businesses was particularly impressive***, with Cardiovascular achieving mid-teens growth in DES sales and ***CRM recording its fifth consecutive quarter of double-digit growth in the U.S.***"

\*        \*        \*

Worldwide sales of the Company's CRM products for the second quarter – on a reported basis – were as follows:

| (in millions) | U.S. | | International | | Worldwide | |
|---|---|---|---|---|---|---|
| | Q2 2009 | Q2 2008 | Q2 2009 | Q2 2008 | Q2 2009 | Q2 2008 |
| ICD systems | $315 | $276 | $139 | $144 | $454 | $420 |
| Pacemaker systems | 90 | 88 | 65 | 70 | 155 | 158 |
| | ------ | ------ | ------ | ------ | ------ | ------ |
| Total CRM products | $405 | $364 | $204 | $214 | $609 | $578 |
| | === | === | === | === | === | === |

\*        \*        \*

## Guidance for Third Quarter and Full Year 2009

The Company estimates net sales for the third quarter of 2009 of between $2.0 billion and $2.1 billion.   Adjusted earnings, excluding intangible asset impairment charges; acquisition-, divestiture-, litigation- and restructuring-related charges; and amortization expense, are estimated to range between $0.17 and $0.21 per share.   The Company estimates net income on a GAAP basis of between $0.08 and $0.13 per share.

*The Company has updated its net sales estimate for the full year of 2009 to between $8.1 billion and $8.4 billion*.   The Company expects adjusted earnings, excluding intangible asset impairment charges; acquisition-, divestiture-, litigation- and restructuring-related charges; discrete tax items, and amortization expense, for the full year of between $0.82 and $0.86 per share.   The Company expects net income on a GAAP basis of between $0.47 and $0.53 per share.

50.     On October 19, 2009, BSX issued a press release, which was reviewed and approved by the Board, entitled "Boston Scientific Announces Results for Third Quarter Ended September 30, 2009," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.   The release included the following statements:

**Third quarter highlights (Sales growth rates are constant currency):**

- Increased sales three percent to $2.025 billion and achieved adjusted EPS of $0.19, both within the Company's guidance ranges

- Reported GAAP EPS of $0.13, at the high end of the Company's range

- 19 -

- Maintained leadership position in the worldwide drug-eluting stent (DES) market with a 41 percent share, including a 49 percent share of the U.S. market and a 47 percent share of the Japanese market

- ***Increased worldwide cardiac rhythm management (CRM) product sales eight percent***

- Increased worldwide Endosurgery sales eight percent, including a 10 percent increase in Endoscopy sales

- Increased worldwide Neuromodulation sales 21 percent

- Prepaid $225 million of term loan debt

- Settled 14 outstanding patent litigation matters with Johnson & Johnson

"So far this year, ***CRM market growth has not been as strong as expected, but our CRM business has continued to grow***, and we have not seen the slowdown in hospital stocking described by St. Jude," said Ray Elliott, President and Chief Executive Officer of Boston Scientific.

\*       \*       \*

Worldwide CRM sales for the third quarter – on a reported basis – were as follows:

| (in millions) | U.S. | | International | | Worldwide | |
|---|---|---|---|---|---|---|
| | Q3 2009 | Q3 2008 | Q3 2009 | Q3 2008 | Q3 2009 | Q3 2008 |
| ICD systems | $314 | $291 | $131 | $132 | $445 | $423 |
| Pacemaker systems | 90 | 86 | 73 | 63 | 163 | 149 |
| | ------- | ------ | ------ | ------ | ------ | ------ |
| | 404 | 377 | 204 | 195 | 608 | 572 |
| Electrophysiology | 30 | 30 | 8 | 10 | 38 | 40 |
| | ------ | ------ | ------ | ------ | ------ | ------ |
| Total CRM | $434 | $407 | $212 | $205 | $646 | $612 |
| | === | === | === | === | === | === |

\*       \*       \*

## Guidance for Fourth Quarter and Full Year 2009

The Company estimates net sales for the fourth quarter of 2009 of between $2.025 billion and $2.125 billion. Adjusted earnings – excluding acquisition-related credits, restructuring and restructuring-related costs, and amortization expense – are estimated to range between $0.17 and $0.21 per share.  The Company estimates net income on a GAAP basis of between $0.20 and $0.25 per share.

The Company has updated its net sales estimate for the full year of 2009 to between $8.134 billion and $8.234 billion. The Company now expects adjusted earnings for the full year – excluding intangible asset impairment charges; acquisition-, divestiture-, and litigation-related net charges; restructuring and restructuring-related costs; discrete tax items; and amortization expense – of between $0.75 and $0.79 per share. The Company expects net income on a GAAP basis of between $0.43 and $0.48 per share.

51.    As a result of BSX's 3Q09 earnings release issued on October 19, 2009, which revealed declining sales of and demand for BSX's CRM products, the value of BSX's common stock declined 15.6% in a single day, falling from $10.16 to close at $8.57. Public disclosures shortly after this announcement demonstrate that a significant reason for the decline in demand was that defendants had suddenly reversed their practice of making charitable contributions and providing other improper benefits to health care providers to induce them to purchase BSX products. Similarly, on November 6, 2009, defendants caused BSX to issue its Report on Form 10-Q for 3Q09, which disclosed that "[o]n September 25, 2009, we received a subpoena from the U.S. Department of Health and Human Services, Office of Inspector General, requesting certain information relating to contributions made by CRM to charities with ties to physicians or their families." Just one day earlier, BSX filed a Report on Form 8-K with the SEC disclosing that "William F. McConnell, Jr., the Company's Senior Vice President for Sales, Marketing and Business Strategies, CRM and one of our named executive officers, informed his management team of his decision to retire from the Company as of December 31, 2009."

52.    The inflation was not completely eliminated by this decline, because the October 19, 2009 announcement did not reveal BSX's crackdown on illegal charitable contributions and the other misconduct that had been used to artificially boost CRM sales and demand, nor did it reveal the extent to which CRM sales had declined due to the cessation of this misconduct or due to concerns over the faulty header on some of its CRT-D

products.   Hence, while the announcement revealed the economic impact of these fraudulently concealed conditions, partially correcting the market price for BSX stock, it did not reveal their root cause, thereby maintaining some of the artificial inflation in the price, and continuing to mislead investors about BSX's business practices and the continued risks to its revenues and business reputation.

53.   Rather than admitting that the Company's sales force had been inflating demand through the use of improper inducements to health care professionals and was under investigation for doing so, Leno claimed that the reduced sales in the quarter resulted from lower sales by newly hired sales staff:

> Now let's turn to guidance.  [As] we began 2009, we expected our sales and earnings in the last half of 2009 would be substantially higher than the first half.  We performed well throughout the first six months of this year but ***the following issues some of which began to show up in our third quarter will cause us to fall short of the original expectations in the last half of this year***.  Beginning in the last half of 2008 and throughout 2009, ***we planned to add many CRM reps, that we expected would drive significant incremental revenue in the back part of this year.  We have indeed added these reps in the US, Europe, and Japan, and most have completed training, but they're [sic] effectiveness in the field will take longer than we had originally envisioned***.

54.   On December 10, 2009, BSX announced the pricing of a public offering of $2 billion aggregate principal amount of its senior notes under the Company's shelf registration statement.  The offering closed on December 14, 2009, and consisted of $850 million of 4.50% notes due January 2015, $850 million of 6.00% notes due January 2020 and $300 million of 7.375% notes due January 2040.

55.   On December 23, 2009, BSX issued a press release entitled "Boston Scientific Announces Settlement of DOJ Investigation Relating to Post-Market Surveys Conducted By Guidant."  In the press release, the Company revealed that it had entered into a Corporate Integrity Agreement with HHS agreeing to strict new disclosure and audit

requirements designed to prevent BSX from further violations of the Anti-Kickback Statute

and other requirements of federal law governing charitable contributions and other payments

to health care professionals by medical equipment manufacturers.  The release included the

following statements:

> Boston Scientific Corporation today announced that it has entered into a civil settlement with the U.S. Department of Justice regarding the Department's investigation relating to certain post-market surveys conducted by Guidant Corporation before Boston Scientific acquired Guidant in 2006.  Boston Scientific had previously disclosed the investigation, which was conducted by the United States Attorney's office in Boston.

> This civil settlement brings to a conclusion an investigation that began in 2005 and involves no admission of wrong doing by the Company.  Under the terms of the settlement, the Company has agreed to pay $22 million, which was previously fully accrued.

> ***The Company also agreed to enter into a Corporate Integrity Agreement (CIA) with the Office of Inspector General for the U.S. Department of Health and Human Services.  The CIA requires enhancements to certain compliance procedures related to financial arrangements with health care providers.  It is limited to the Company's cardiac rhythm management business, which became part of Boston Scientific through the Guidant acquisition***.

56.     This news came as a shock to shareholders because, during the Relevant

Period, the Individual Defendants claimed that the Company's business practices complied

with the Code of Ethics established by the Advanced Medical Technology Association

("AdvaMed").  For example, in the Compliance and Ethics section of its website, the

Company represented: "We respect the obligation of health care professionals to make

independent decisions that are in the best interest of patient care.  Selection of medical

devices should be based solely on their effectiveness, quality and value."  Defendants also

claimed BSX to be "an early supporter of the AdvaMed ethical code," and even provided a

link to that code from the Company's website.

57.     The AdvaMed code governs interactions between medical equipment manufacturers such as BSX and physicians or other health care professionals involved in purchasing, or recommending the purchase of, medical equipment and supplies.  The code contains strict proscriptions against providing inducements to health care professionals to purchase products, including prohibitions on the provision of entertainment and recreational activities, more than modest and occasional meals, and educational and promotional gifts. While the code permits certain research and educational grants and charitable donations, it expressly prohibits the use of such donations as an inducement to purchase goods, and further provides that "sales personnel should not control or unduly influence the decision of whether a particular Health Care Professional or institution will receive a grant or donation or the amount of such grant or donation."

58.     On February 10, 2010, BSX issued a press release, which was reviewed and approved by the Board, entitled "Boston Scientific Announces Results for Fourth Quarter and Year Ended December 31, 2009," which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.  The release included the following statements:

> Boston Scientific Corporation today announced financial results for the fourth quarter and full year ended December 31, 2009, as well as guidance for net sales and earnings per share (EPS) for the first quarter and full year 2010.
>
> **Fourth quarter highlights (sales growth rates are at constant currency):**
>
> - Recorded net sales of $2.079 billion, at the mid-point of the Company's guidance range, and achieved adjusted EPS of $0.20, at the high end of the Company's guidance range, reporting a GAAP loss of $0.71 per share
>
> - Maintained leadership position in the worldwide drug-eluting stent (DES) market with a 39 percent share, including a 46 percent share in the U.S. and a 44 percent share in Japan

- Increased worldwide Endoscopy sales 10 percent for the quarter, and reached the $1 billion milestone in 2009 worldwide sales

- Increased worldwide Urology/Gynecology sales eight percent, including 23 percent growth in our Women's Health business

- Increased worldwide Neuromodulation sales 18 percent

- Generated 44 percent of sales from new products

- Received CE Mark approval and launched the internally developed and manufactured PROMUS® Element™ Everolimus-Eluting Coronary Stent System in Europe

- Launched the COGNIS® cardiac resynchronization therapy defibrillator (CRT-D) and TELIGEN® implantable cardiac defibrillator (ICD) systems in Japan

- Issued $2.0 billion of senior notes and prepaid remaining term loan debt maturities

- Received ratings upgrade to investment grade (BBB-) from Standard & Poor's

- Resolved longstanding litigation with settlement of $1.725 billion

"We delivered a quarter in line with expectations, coming in at the middle of our sales range and the high end of our adjusted earnings range," said Ray Elliott, President and Chief Executive Officer of Boston Scientific. "Endoscopy, Urology/Gynecology and Neuromodulation posted excellent growth, and we maintained our clear leadership in the global drug-eluting stent market.   In Japan, we have launched COGNIS, TELIGEN and our PROMUS® Everolimus-Eluting Coronary Stent System, three important new products in this key market.   COGNIS and TELIGEN, the smallest and thinnest high-energy devices, are now available worldwide."

"The litigation settlement announced last week with Johnson & Johnson is part of our ongoing effort across the Company to reduce risk," said Elliott."  We have the financial strength and flexibility to meet this obligation with no appreciable impact on our debt covenants and still retain significant liquidity."

**<u>Fourth Quarter 2009</u>**

Net sales for the fourth quarter of 2009 were $2.079 billion, as compared to net sales of $2.002 billion for the fourth quarter of 2008. Excluding the impact of foreign currency and net sales from divested businesses, net sales were flat with the prior period.

Worldwide Cardiac Rhythm Management (CRM) group net sales for the fourth quarter on a reported basis were as follows:

| (in millions) | U.S. Q4 2009 | U.S. Q4 2008 | International Q4 2009 | International Q4 2008 | Worldwide Q4 2009 | Worldwide Q4 2008 |
|---|---|---|---|---|---|---|
| ICD systems | $307 | $299 | $142 | $128 | $449 | $427 |
| Pacemaker systems | 82 | 84 | 76 | 60 | 158 | 144 |
| | ------- | ------ | ------ | ------ | ------ | ------ |
| | 389 | 383 | 218 | 188 | 607 | 571 |
| Electrophysiology | 29 | 29 | 9 | 8 | 38 | 37 |
| | ------ | ------ | ------ | ------ | ------ | ------ |
| Total CRM group | $418 | $412 | $227 | $196 | $645 | $608 |
| | === | === | === | === | === | === |

\*        \*        \*

## Full Year 2009

Net sales for the full year 2009 were $8.188 billion, as compared to net sales of $8.050 billion for the full year 2008, which included sales from divested businesses of $69 million. Excluding the impact of foreign currency and net sales from divested businesses, net sales increased four percent over the prior period.

Worldwide CRM group sales for the full year – on a reported basis – were as follows:

| (in millions) | U.S. 2009 | U.S. 2008 | International 2009 | International 2008 | Worldwide 2009 | Worldwide 2008 |
|---|---|---|---|---|---|---|
| ICD systems | $1,248 | $1,140 | $544 | $541 | $1,792 | $1,681 |
| Pacemaker systems | 346 | 340 | 275 | 265 | 621 | 605 |
| | ------- | ------ | ------ | ------ | ------ | ------ |
| | 1,594 | 1,480 | 819 | 806 | 2,413 | 2,286 |
| Electrophysiology | 116 | 116 | 33 | 37 | 149 | 153 |
| | ------ | ------ | ------ | ------ | ------ | ------ |
| Total CRM group | $1,710 | $1,596 | $852 | $843 | $2,562 | $2,439 |
| | === | === | === | === | === | === |

59.   The further extent of the harm defendants caused to BSX was uncovered on February 10, 2010, when BSX revealed: (i) continued sales declines in CRM products and reduced expectations going forward because a number of sales people had been fired or quit after being disciplined for using illegal charitable contributions to illegally boost CRM sales; (ii) sweeping management and organizational changes and a major business restructuring

designed to improve operational results and increase accountability, much of which was required by HHS as a result of its investigation into the illegal charitable contributions by CRM sales people; and (iii) concerns over the safety and reliability of some of its ICD systems.  On this revelation, BSX suffered additional economic harm, losing 10% of its market capitalization.

60.    BSX's 4Q09 earnings release on February 10, 2010 included the following statements revealing the impact of the foregoing conditions:

### Guidance for First Quarter and Full Year 2010

The Company estimates net sales for the first quarter of 2010 of between $2.000 billion and $2.100 billion.  Adjusted earnings, excluding acquisition-related credits, restructuring and restructuring-related costs, and amortization expense, are estimated to range between $0.13 and $0.17 per share.  The Company estimates net income on a GAAP basis of between $0.14 and $0.20 per share.

The Company estimates net sales for the full year 2010 of between $8.100 billion and $8.500 billion.  Adjusted earnings, excluding acquisition-related credits, restructuring and restructuring-related costs, and amortization expense, are estimated to range between $0.62 and $0.72 per share.  The Company estimates net income on a GAAP basis of between $0.37 and $0.49 per share.

61.    Also on February 10, 2010, BSX issued a press release, which was reviewed and approved by the Board, entitled "Boston Scientific Announces Management Changes and Restructuring Initiatives," which revealed the management changes and business reorganization required as a result of the housecleaning in the CRM business.  That release stated, in part:

Boston Scientific Corporation today announced a series of management changes and restructuring initiatives designed to strengthen the Company and position it for long-term success.

"The actions we are announcing today will provide the organizational structure and leadership needed to execute our strategic plan and fulfill the enormous promise of this company," said Ray Elliott, President and Chief Executive Officer of Boston Scientific.  "They are aimed at driving innovation, accelerating profitable growth *and increasing* both

*accountability* and shareholder value. Above all else, they will help us better serve our customers and their patients."

Key components of the management changes and restructuring initiatives include:

- The Cardiovascular Group and Cardiac Rhythm Management Group (formerly Guidant) will be combined into one, stronger and more competitive organization that will deliver better value to hospitals, better solutions to physicians and better outcomes to patients. ***This combined organization will also position the Company to respond more efficiently and effectively to rapidly accelerating changes in the procurement, reimbursement and regulatory environments, and to other changes in the delivery of health care globally***. The new organization will be led by Hank Kucheman, who has been promoted to Executive Vice President and President of the new Cardiology, Rhythm and Vascular Group. Mr. Kucheman most recently served as President of the Cardiovascular Group. The Group will increase its focus on structural heart, disruptive, primary prevention ICDs, atrial fibrillation and hypertension. The Endovascular Unit, including Peripheral Solutions, Neurovascular, Imaging, Electrophysiology and the Canadian business unit, will report to new Senior Vice President and Executive Committee member, Joe Fitzgerald.

- Fred Colen has been promoted to the new role of Executive Vice President and Chief Technology Officer (CTO). As CTO, Mr. Colen will oversee a centralized corporate research and development group that will refocus and strengthen the Company's innovation efforts. Under Mr. Colen's leadership, the Company will change its allocation of R&D resources to incorporate its newly established growth priorities, create technology Centers of Excellence, drive improved product development timing and efficiency, and expand the spectrum of new product opportunities. ***Mr. Colen most recently served as President of the Cardiac Rhythm Management Group***.

62. In early February 2010, in the journal *HeartRhythm*, Drs. Joseph J. Germano, Alicia Darge and William H. Maisel presented a case study of a man implanted with a BSX COGNIS CRT-D system. The man experienced inappropriate ICD shocks within hours of receiving his new device. The commentary to the case study explained that the device header abnormality "appears to result from a manufacturing defect."

63. The Company responded in a February 10, 2010 press release, which was reviewed and approved by the Board, entitled "Boston Scientific Rebuts HeartRhythm

Article."  The release included the following statements regarding newly reported defects in the Company's COGNIS CRT-D system, which was delivering inappropriate shocks to patients who had the device planted subpectorally (under the pectoral muscle), leading to multiple episodes of anti-tachycardia (fast heartbeats induced to break a cycle of tachycardia before it becomes life-threatening):

> "We find it unacceptable that HeartRhythm rushed this manuscript to publication and speculated on the cause of the problem without requesting from us a detailed engineering analysis of the explanted device.  Our analysis found that while the bond between the header and the case was weakened, the device functioned normally and a weakened header bond was not the cause of the abnormal sensing and pacing impedance observed in this patient.

> "X-ray analysis and electrical testing verified that the header wires were neither fractured nor otherwise damaged, and the seal between the header and the case was secure with no evidence of body fluid under the header.  In short, there is no mechanism to link the noise observations to a weakened header bond.

> "Noise observations during the initial implant were not header-related.  In fact, the authors themselves stated: 'It is possible that the initial noise observed on the RV pace/sense channel was due to an RV lead abnormality and not to the header abnormality.'  None of the leads implanted in the patient were manufactured by Boston Scientific.

> "Including this most recent case, only three instances of weakened header bonds have been observed in a context of more than 90,000 COGNIS and TELIGEN devices implanted subcutaneously.  The overall rate of events for this device family compares very favorably to the performance of similar devices and is well within accepted performance ranges.

64.    During a February 11, 2010 conference call, Elliott continued to criticize the medical journal for reporting on the defect, even while admitting that the Company needed to fix it:

> HeartRhythm was completely out of line to publish this article prematurely, without even requesting our engineering analysis of the explanted device. We conducted our own analysis that became abundantly clear that our device worked normally and that the weakened header bond was not the problem. We believe the problem was caused by a competitors' lead, not our device. Even if you count this case, we've seen only three cases of potential problems with header bond in subcutaneous implant out of more than 90,000 cases.  Those numbers are well within accepted norms.  ***We've improved the***

- 29 -

**bond and we're getting these devices out to customers, allowing for either subpectoral or subcutaneous implantation. This transition should be completed next month**.

65.     In the February 10, 2010 press release, defendants had similarly reassured BSX shareholders by claiming that BSX had already obtained regulatory approval for and implemented manufacturing process changes to fix the header problems:

> "**We have implemented manufacturing process improvements to strengthen the header bond on these devices, allowing physicians to implant devices in either a subpectoral or subcutaneous position. We have received approval from U.S. and European regulatory authorities for the devices with the strengthened header bond and have been shipping these devices**. We expect to complete the transition to these devices by next month."

66.     On February 12, 2010, the authors of the *HeartRhythm* article responded to the Company's rebuttal of their report, denying in an article published on heart*wire* (www.theheart.org) that the article was published before the journal had BSX's analysis:

> [Beth Israel Deaconess Medical Center Dr. William H.] Maisel and [Winthrop-University Hospital Dr. Joseph J.] Germano said they did indeed receive a copy of the company's analysis before submitting the case report to the journal. In fact, some of the report details were included in their paper, they say.
>
> "Quite frankly I'm a little bit at a loss to explain Boston Scientific's reaction," Maisel told heart*wire*. "We're a little bit confused by their statement that the journal published it before we'd received the manufacturing analysis, because **we had a letter from them with the analysis, dated prior to the acceptance date of the manuscript**."

67.     According to the study authors, there was no question that the BSX product had failed. In fact, heart*wire* reported that BSX had long known about the header problems, and even issued an advisory to physicians on December 1, 2009, warning them against implanting the device under the pectoral muscle of heart patients:

> As Germano explained to heart*wire*, when device interrogation detected the inappropriate therapies, he and his colleagues first suspected the lead, which they replaced. **But when the events continued, they opted to replace the generator itself. That's when they noticed that the header – the structure that connects the leads to the main device – was partially**

*detached from the device itself.  "It was impressive," Germano said.  "This wasn't a subtle finding*."

**Header problem already acknowledged**

*Boston Scientific, in fact, was already aware of what it described as a rare, weakened header-bond problem with two brands of devices – the Cognis CRT-D and the Teligen ICD.  The company had sent a "Dear Doctor" letter in December 2009, warning physicians that mechanical stress associated with subpectoral implantation may weaken the bond between the header and the titanium case of the device itself*.  In this December announcement, Boston Scientific said it was aware of two subpectoral cases, worldwide, of weakened header bonds.  The December alert also estimated that just 5% of the 77,000 Cognis and Teligen devices implanted worldwide would have been implanted in the subpectoral location.

68.     Market analysts reacted negatively to these disclosures.  As Credit Suisse wrote in its February 12, 2010 research report entitled "The Situation: Not Good":

In cardiac rhythm management, the company gained share in 2009 however it now appears that *such share gains may have been helped by questionable sales practices*.  Boston Scientific indicated it let go some CRM personnel due to noncompliance with the company's ethic policy.  Boston Scientific also issued a CRM product advisory in December.  *The combination of the disciplinary actions and the product advisory may cost the company, by its own estimates, $100 million in revenues in 2010.  All things considered, we do not believe the shares are attractive at current levels*.

69.     On February 26, 2010, BSX issued its Report on Form 10-K for 2009.

Attached as Exhibit 10.67 to that report was the Corporate Integrity Agreement the Company had signed with HHS to resolve government investigations and regulatory actions resulting from the charitable contributions and other misconduct that had been used to illegally improve CRM sales.  Representatives of BSX, including defendant Elliott, and HHS signed the Corporate Integrity Agreement on December 22 and 23, 2009.  The Corporate Integrity Agreement regulates, for a period of five years, every arrangement or transaction between BSX and any actual or potential source of business or referrals.  The agreement, among other conditions, provides for: annual reporting and auditing requirements by an Independent Review Organization to assure compliance with federal laws and regulations, including the

Anti-Kickback Statute; creation of a database to track all existing and new arrangements with health care professionals; prohibiting inducements to health care professionals; the adoption of policies to restrict compensation arrangements which provide financial incentives to employees to engage in improper promotion, sales, marketing, pricing or contracting activities; and adoption of policies and procedures to control the use of charitable contributions to health care professionals. The Corporate Integrity Agreement provides that the Company must create and maintain the position of a Chief Compliance Officer. The Chief Compliance Officer is responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in the Corporate Integrity Agreement and with federal health care program requirements. The Chief Compliance Officer must make at least quarterly reports to the Board regarding the Company's compliance.

70.     On March 2, 2010, former U.S. Senator Warren Rudman and Walt Disney Co. Chairman John Pepper both unexpectedly announced they would be leaving BSX's Board of Directors. Rudman had served on the Board since 1999 and Pepper since 2003. No reasons were offered for their sudden departures.

71.     On March 15, 2010, before the market opened, shareholders were stunned when BSX announced that it was suspending sales and was recalling all of its ICD and CRT-D devices because it had changed the manufacturing process for the devices without obtaining FDA approval. The March 15, 2010 press release, entitled "Boston Scientific Announces Ship Hold and Inventory Retrieval of ICD and CRT-D Devices," made clear that the investigation was ongoing, and that the full extent of the problems was not yet known:

> Boston Scientific Corporation announced today that it has stopped shipment and is retrieving field inventory of all its implantable cardioverter defibrillators (ICDs) and cardiac resynchronization therapy defibrillators (CRT-Ds).

The Company has determined that some manufacturing process changes were not submitted for approval to the U.S. Food and Drug Administration (FDA).  *At this time,* the company has identified two instances of changes that, while successfully validated, were not submitted to the FDA.  Boston Scientific has informed the FDA and plans to work closely with the agency to resolve this situation as soon as possible.

The Company has no indication that the manufacturing process changes pose any risk to patient safety, and it is not recommending explantation of the devices.

Product families included in this advisory include: COGNIS®, CONFIENT™, LIVIAN™, PRIZM™, RENEWAL®, TELIGEN® and VITALITY™.  The Company's pacemakers and other products are not affected by this advisory.

"A planned process review revealed that two manufacturing process changes were not submitted for FDA approval," said Ray Elliott, President and Chief Executive Officer of Boston Scientific.  "We are acting voluntarily and expeditiously to resolve this situation, and we have seen no evidence of any risk to patient safety.  We apologize for the inconvenience these actions will cause patients and physicians."

***The Company plans to fully evaluate the impact of these actions on its financial results and provide an update when the evaluation is completed.  Given the financial uncertainty involved, these actions could have a material impact on the Company's previously issued guidance, including revenue, operating profit and cash flows for the first quarter and full year of 2010***.

72.     When the recall was announced, defendants assured shareholders that it resulted from a mere clerical error and was therefore likely to be resolved in a matter of weeks by the FDA.  On March 29, 2010, the Company was forced to admit that the FDA had not agreed to an expedited review of the matter, suggesting the issues were more complex than previously indicated.   Some analysts predicted it could take months to resolve the issue, and that BSX could lose $469 million in sales over the next two years as a result.

73.     On March 30, 2010, *The Wall Street Journal* reported that the Justice Department and the SEC had opened investigations into the recall, "seeking company documents regarding the company's discovery that it hadn't gotten FDA approval, as well as communications with regulators, physicians and stock analysts about the withdrawal."

74.     The foregoing statements issued by defendants during the Relevant Period were materially false and misleading because they misrepresented existing facts known to defendants or that were recklessly disregarded by them, or omitted to disclose facts that defendants knew or disregarded, which were necessary to make the statements made not misleading to investors, including the following:

(a)     The statements about CRM sales, demand, market share and growth, and the strength and success of BSX's CRM sales force, were all materially misleading in that they failed to disclose that sales and demand had been substantially and materially inflated by the payment of illegal and improper inducements to health care professionals.

(b)     The statements about CRM sales and demand were also materially misleading in that they failed to disclose that a material portion of the reported or anticipated revenues resulted from the sale of products which had been manufactured without required FDA approval, such that they were subject to recall and refund or replacement.

(c)     The financial guidance provided in BSX's earnings releases and on investor conference calls was misleading in that it omitted to disclose that sales estimates had been materially inflated by sales expected to be achieved through the payment of illegal and improper inducements.

(d)     The statements about weaker than expected growth in the CRM market in 3Q09 were misleading because they failed to disclose the extent to which demand had weakened due to the curtailment and cessation of payments of illegal and improper inducements to health care professionals and by attributing weakened demand to other factors.

(e)     The statements about CRM sales in general and sales of COGNIS and TELIGEN ICDs in particular were materially misleading because defendants failed to timely or fully disclose the problems and defects in the headers of the devices.

(f)     The disclosure on December 23, 2009 regarding the Corporate Integrity Agreement was misleading because it implied that the agreement was related entirely to the pre-acquisition investigation of and misconduct by Guidant, and failed to disclose that the agreement resulted from or was otherwise related to an investigation into similar *post-*acquisition and *on-going* business activities that threatened BSX's current and future revenues and business reputation.

## DAMAGES TO BSX

75.     As a result of the Individual Defendants' improprieties, BSX has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     kickbacks and unlawful charitable contributions made in violation of applicable laws;

(b)     costs incurred in investigating the complaints of wrongdoing made by the governmental agencies;

(c)     costs incurred in responding to the SEC and DOJ investigations, plus potentially hundreds of millions of dollars in settlements or to satisfy adverse findings;

(d)     costs incurred in defending BSX in consumer class actions, plus potentially hundreds of millions of dollars in settlements or to satisfy any adverse judgments;

(e)     costs incurred from compensation and benefits paid to the Individual Defendants, who as directors and/or officers have breached their duties to BSX;

(f)      costs incurred in implementing the provisions and requirements of the

Corporate Integrity Agreement;

(g)      costs incurred from recalling the Company's ICD and CRT-D devices;

(h)      lost sales due to the Company's inability to sell its ICD and CRT-D

devices; and

(i)      costs incurred in defending BSX and certain defendants in the federal

securities class action, plus potentially hundreds of millions of dollars in settlements or to

satisfy any adverse judgment.

76.      Moreover, these actions have irreparably damaged BSX's corporate image

and goodwill.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77.      In committing the wrongful acts alleged herein, the Individual Defendants

have pursued, or joined in the pursuit of, a common course of conduct, and have acted in

concert with and conspired with one another in furtherance of their common plan or design.

In addition to the wrongful conduct herein alleged as giving rise to primary liability, the

Individual Defendants further aided and abetted and/or assisted each other in breaching their

respective duties.

78.      During all times relevant hereto, the Individual Defendants, collectively and

individually, initiated a course of conduct that was designed to and did: (i) conceal the fact

that they had caused the Company to engage in violations of federal anti-kickback and false

claims laws; (ii) enhance the Individual Defendants' executive and directorial positions at

BSX and the profits, power, and prestige that the Individual Defendants enjoyed as a result

of holding these positions; and (iii) deceive the public, including BSX's shareholders, via

false and misleading proxy statements, regarding the Individual Defendants' management of

BSX's operations, the Company's adherence to applicable laws, and its future business prospects.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

79.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

**General Derivative Allegations**

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth herein.

81.     Plaintiff brings this action derivatively in the right of and on behalf of BSX to redress injuries suffered, and to be suffered, by BSX as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  BSX is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

82.     Plaintiff will adequately and fairly represent the interests of BSX in enforcing and prosecuting its rights.

83.     Plaintiff was an owner of BSX stock at all times relevant to the wrongful course of conduct alleged herein, and remains a shareholder of the Company.

**Pre-Suit Demand Is Futile**

84.      As set forth below, by virtue of: (i) the long-running nature of the wrongdoing; (ii) defendants' tenures on the Board and committees thereof which were designed to monitor and ensure BSX's (and its subsidiaries') compliance with federal and state regulations and law; and (iii) defendants' signing of Company filings (including Annual Reports) which acknowledged extensive and lengthy investigations into business practices regarding different product lines, defendants were aware of the kickback and charitable contributions scheme as well as the improper statements concerning the FDA's non-approval and the Company's withdrawal because of compliance defects.

**Current Board**

85.      The BSX Board currently consists of twelve individuals including the following: Abele, Elliott, Bartlett, Connors, Fox, Groves, Mario, P. Nicholas, N.J. Nicholas, Reinhardt and Sununu.

86.      Plaintiff has not made a demand on the present Board to institute this action because such a demand would have been a futile and useless act.

87.      Any suit by the current directors of BSX to remedy the wrongs complained of herein would expose the defendants themselves and their friends and business allies to significant personal liability for their breaches of fiduciary duties and other misconduct. Each officer and director of BSX owed BSX and/or its shareholders the duty to exercise a high degree of loyalty, good faith, independence and candor in the management and administration of the affairs of the Company.  The Current Director Defendants and former director Tobin have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors for the wrongful conduct described herein.  Each of these defendants is accused of wrongdoing and

recommending, approving and signing Company filings, and thus faces a substantial likelihood of liability thereby rendering any demand upon them futile.

88.    The Individual Defendants were aware of and participated in and approved the wrongs alleged herein.  Thus, they have knowingly chosen not to exercise the fiduciary duties of loyalty, good faith, independence, and candor owed to the Company, to protect BSX or to rectify the illegal and wrongful practices complained of herein.  They therefore have approved of and continue to participate in a course of corporate misconduct that includes the following:

(a)    Approving and/or condoning the illegal conduct and practices described herein.  Each Individual Defendant had the ability and/or opportunity to prevent these practices.  The Board is responsible for overseeing the Company's compliance with legal requirements and, therefore, all directors are liable for not ensuring that the officers and employees of the Company did not expose the Company to unnecessary risk.  In furtherance of this oversight, the Board meets at least quarterly with the Company's Chief Compliance Officer, as mandated by the Corporate Integrity Agreement.  Because the Individual Defendants are liable for approving and directing the illegal conduct described herein, demand would be futile.

(b)    Current Director Defendants Mario and Reinhardt serve on the Audit Committee.  Members of the Audit Committee, because of their position of control and authority over BSX, were able to, and did, directly and indirectly, control the wrongful acts complained of herein.  The members of the Audit Committee failed to ensure that the Company had and maintained adequate internal financial controls and failed to ensure the integrity of the Company's financial statements.  Because members of the Audit Committee had an affirmative duty to ensure that the Company maintained adequate internal controls

over financial reporting and the integrity of the Company's financial statements and failed to do so, members of the Audit Committee breached their fiduciary obligations due the Company. Accordingly, the Current Director Defendants on the Audit Committee could not impartially respond to a demand and it would have been futile.

(c)     The wrongful conduct complained of herein by the Individual Defendants amounted to breaches of their fiduciary duties of good faith, independence, loyalty and candor to BSX and its shareholders.

(d)     The Individual Defendants, in particular the current and former members of the Audit Committee, refused to put into place adequate internal controls and adequate means of supervision to stop the wrongful conduct alleged herein despite the fact that the Board knew and/or recklessly ignored such wrongful business practices. These acts, and the acts alleged in this action, demonstrate a pattern of gross misconduct, which conduct is not taken honestly and in good faith.

(e)     Moreover, despite the Individual Defendants having had knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for BSX for any of the wrongdoing alleged by plaintiff herein.

89.     A majority of the current Board – defendants Abele, Bartlett, Elliott, Fox, Groves, Mario, N. Nicholas, P. Nicholas, Reinhardt and Sununu – were also directors during the time the illegal kickback and charitable contribution scheme and regulatory failings occurred. These Board members approved of the illegal kickback scheme or tacitly approved it by looking the other way during the widespread and far reaching scheme. Therefore, a majority of the members of the current Board are not disinterested with respect to the allegations in this Complaint. The approval of actions by the Company that violate

applicable law can never be protected by the business judgment rule.  Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

90.     Further, this action does not arise from a single incident, but numerous different schemes, some of which lasted several years, which involved hundreds of millions of dollars, and were common knowledge throughout the Company.  Serious violations of applicable law occurred systematically and at every level of the Company as a direct result of the Board's decision to embrace a policy of calculated legal violations as the Company's deliberate sales and business strategy.  There is no legitimate "business judgment" involved in devising or carrying out such an unlawful policy.  Accordingly, demand on the Board is excused.

91.     The Individual Defendants are incapable of impartially considering a demand because they face a substantial likelihood of liability for their role in the illegal kickback scheme and other improper conduct.  Pursuant to Delaware and Massachussets law and the Company's own Corporate Governance Guidelines and Code of Conduct, these Board members were required to stay actively involved in the management of the Company and act to prevent BSX from violating applicable laws and regulations.  Each of these directors, however, knowingly chose not to act to stop and prevent further violations of federal laws and regulations in the face of numerous and overwhelming facts alerting them to what was occurring at the Company, including the breadth of and length of time of the wrongdoing that occurred, the amount of money being exchanged pursuant to the scheme, and that the scheme was prevalent at BSX.

92.     In addition, defendants Bartlett, Connors, Fox, Groves, Mario, N.J. Nicholas, Reinhardt and Sununu also occupied positions at the Company and on Board committees

during the Relevant Period that charged them with even greater responsibility for oversight of the Company.

93.     All of the Individual Defendants signed the Company's disclosures, including the Annual Reports on Form 10-K, many of which described the investigations by the various state and federal regulators into the conduct alleged herein.  Due to the Individual Defendants' responsibilities to BSX and the widespread violation of applicable law at the Company, to the extent that any of them did not have actual knowledge of the violations, such lack of knowledge could only be the product of willful blindness that constitutes a bad faith breach of their duties.

94.     Moreover, these defendants were required to act upon this information to protect the Company from continued legal violations being committed in its name.  Rather than doing so, these defendants, in violation of their legal obligations, consciously ignored the information presented to them concerning the Company's extensive legal violations. As a result, the Individual Defendants face a substantial likelihood of liability for their conduct and demand is, therefore, excused.

95.     Defendants Elliott, Tobin and Leno bear a substantial likelihood of liability arising from their violation of the federal securities laws in connection with their false and misleading statements and omissions.  As set forth herein, those statements and omissions were materially inaccurate and incomplete, which caused significant harm to the Company.  As a result, these defendants each bear a substantial likelihood of liability for their violations of the federal securities laws, are conflicted and not disinterested with respect to such claims, and are fundamentally disabled from impartially considering a demand to impose liability on themselves for violating their own statutory disclosure obligations.

96.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by BSX's officers and directors and these acts are incapable of ratification.

97.     Despite having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover on behalf of BSX for any of the wrongdoing alleged by plaintiff herein.

98.     Any suit by the current directors of BSX to remedy these wrongs would likely expose the Individual Defendants and BSX to further violations of federal laws that would result in civil actions being filed against one or more of the Individual Defendants. Thus, they are hopelessly conflicted from making an independent determination whether to sue themselves.

99.     BSX has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for BSX any part of the damages BSX has suffered and will continue to suffer thereby.

100.    Plaintiff has not made any demand on the other shareholders of BSX to institute this action since such demand would be a futile and useless act for at least the following reasons:

        (a)     BSX is a publicly held company with over 1.5 billion shares outstanding and thousands of shareholders;

        (b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)      making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

101.    Plaintiff incorporates by reference ¶¶1-100 above.

102.    As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and/or directors of BSX owed BSX fiduciary obligations of loyalty, good faith, independence and candor in the management and administration of the affairs of the Company and were and are required to use their utmost ability to manage BSX in a fair, just, honest, and equitable manner.

103.    The Individual Defendants violated their fiduciary duties of loyalty, good faith, independence and candor by failing in their enumerated duties, which caused the violations of federal and state law that led to the regulatory actions and the class action.

104.    The Individual Defendants, either directly or through aiding and abetting, further violated their fiduciary duties by abandoning and abdicating their responsibility and duty to prudently managing the assets and business of BSX  in a manner consistent with the operations of a publicly held corporation

105.    In addition, defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused their ability to control and influence BSX, for which they are legally responsible.

106.    As a direct and proximate result of defendants' abuse of control, BSX has sustained significant damages.

107.    As a result of the misconduct alleged herein, the defendants are liable to the Company.

108.    But for the abdication of the Individual Defendants' fiduciary duties, the Company would not have been damaged.  Accordingly, all of the Individual Defendants breached their fiduciary duties.

109.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

110.    Plaintiff, on behalf of BSX, has no adequate remedy at law.

## COUNT II

### Against Individual Defendants for Corporate Waste

111.    Plaintiff incorporates by reference ¶¶1-110 above.

112.    As a result of the improper conduct described herein, and by failing to properly consider the interests of the Company and its public shareholders and by refusing to conduct proper supervision, the Individual Defendants have caused BSX to waste valuable corporate assets and incur expenses to defend defendants' unlawful actions.

113.    As a result of the waste of corporate assets, the defendants are liable to the Company.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

114.    Plaintiff incorporates by reference ¶¶1-113 above.

115.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense and detriment of the Company.  In particular, the Tobin, Elliott and Leno (the "Officer Defendants") were unjustly enriched through bonuses and other incentive compensation that they achieved from increased sales of BSX's products as a result of the illegal kickbacks, the charitable contribution scheme, and the sale of BSC

medical devices without FDA approval.  On information and belief, but for the illegal scheme, the Officer Defendants would not have achieved their annual incentive compensation goals.  Accordingly, because the Officer Defendants' meeting of their compensation goals was the result of the illegal promotion of BSX's products through the scheme rather than through sustainable growth of BSX's business, the Officer Defendants were unjustly enriched by the bonuses and other incentive compensation that they received. In addition, the Current Director Defendants and former director Tobin received the lucrative compensation detailed herein, despite violating their fiduciary duties by participating in and allowing the illegal scheme detailed herein.

116.    Plaintiff, as a shareholder and representative of BSX, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

B.    Directing BSX to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BSX and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be

necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)     a provision to permit the shareholders of BSX to nominate at least three candidates for election to the Board;

(iii)     a proposal to ensure the accuracy of the qualifications of BSX's directors, executives and other employees; and

(iv)     a proposal to appropriately test and then strengthen BSX's internal control functions.

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the Individual Defendants' assets so as to assure that plaintiff on behalf of BSX has an effective remedy;

D.     Awarding to BSX restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


DATED:  August 19, 2010                 BOUCHARD MARGULES &
                                           FRIEDLANDER, P.A.



                                        */s/ Joel Friedlander*
                                        Joel Friedlander (Bar No. 3163)
                                        Sean M. Brennecke (Bar No. 4686)
                                        222 Delaware Avenue, Suite 1400
                                        Wilmington, DE  19801
                                        (302) 573-3500
                                        jfreidlander@bmf-law.com
                                        sbrennecke@bmf-law.com

                                        ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                        DARREN J. ROBBINS
                                        TRAVIS E. DOWNS III
                                        BRIAN O. O'MARA
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        ROBBINS UMEDA LLP
                                        MARC M. UMEDA
                                        KEVIN A. SEELY
                                        JULIA M. WILLIAMS
                                        600 B Street, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/525-3990
                                        619/525-3991 (fax)

                                        Attorneys for Plaintiff

## VERIFICATION

We the Co-Chairmen of the Iron Workers District Counsel of Southern Ohio & Vicinity Pension Trust declare:

We are the duly authorized representative of Iron Workers District Counsel of Southern Ohio & Vicinity Pension Trust, plaintiff in the foregoing action.  We hereby verify that we are familiar with the allegations in the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, and that the foregoing is true and correct to the best of our knowledge, information and belief.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this  10th  day of August, 2010, at Vandalia, Ohio

IRON WORKERS DISTRICT COUNSEL OF SOUTHERN OHIO & VICINITY PENSION TRUST

By: _____

Its: _____

By: _____

Its: _____