# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

IRON WORKERS DISTRICT COUNCIL,
SOUTHERN OHIO & VICINITY PENSION
TRUST, Derivatively on Behalf of BOSTON
SCIENTIFIC CORPORATION,

            Plaintiff,

     v.

J. RAYMOND ELLIOTT, JAMES R. TOBIN,
SAMUEL R. LENO, JOHN E. ABELE,
KATHERINE T. BARTLETT, NELDA J.
CONNORS, MARYE ANNE FOX, RAY J.
GROVES, ERNEST MARIO, PETE M.
NICHOLAS, N.J. NICHOLAS, JR., UWE E.
REINHARDT and JOHN E. SUNUNU,

            Defendants,

     -- and --

BOSTON SCIENTIFIC CORPORATION, a
Delaware corporation

            Nominal Party.

Civil Action No.  1:10-cv-00699-SLR

## DEFENDANTS' REPLY MEMORANDUM
## IN SUPPORT OF MOTION TO DISMISS

Michael P. Kelly, Esq. (#2295)
Daniel M. Silver, Esq. (#4758)
McCarter & English LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
Tel: 302-984-6300
Fax: 302-984-6399
mkelly@mccarter.com
dsilver@mccarter.com

Robert J. Kaler, Esq. (*pro hac vice*)
Edward W. Little, Jr., Esq.
David Himelfarb, Esq.
McCarter & English LLP
265 Franklin Street
Boston, MA 02110
Tel. 617-449-6507
Fax: 617-607-9200
rkaler@mccarter.com

*Attorneys for Defendants*

Dated:  April 13, 2011

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 1

I.  THE INFLAMMATORY ALLEGATIONS IN PLAINTIFF'S OPPOSITION
    ARE NOT SUPPORTED BY THE FACTS PLED IN THE AMENDED
    COMPLAINT OR THE PUBLIC RECORD ..................................................................... 1

II. THE PLAINTIFFS' OPPOSITION DOES NOT PROPERLY DEFINE THE
    STANDARD FOR ESTABLISHING "DEMAND FUTILITY," AND RELIES
    ON SWEEPING CONCLUSIONS OF ILLEGALITY NOT SUPPORTED BY
    THE PARTICULARIZED FACTS PLED ........................................................................ 4

III. THE PLAINTIFFS' OPPOSITION DOES NOT IDENTIFY SUFFICIENT
     PARTICULARIZED FACTS IN THE AMENDED COMPLAINT TO SATISFY
     THE STRINGENT REQUIREMENTS FOR PLEADING "DEMAND
     FUTILITY" .................................................................................................................... 7

     A.  The Amended Complaint Lacks Particularized Allegations Showing That
         The Audit Committee Members Are Not Independent and Disinterested ............ 10

     B.  The AC Lacks the Requisite Particularized Allegations Showing That The
         CQ Committee Members Are Not Independent and Disinterested ...................... 13

     C.  The AC Lacks the Requisite Allegations Showing That J. Raymond Elliott
         Is Not Disinterested and Independent ................................................................. 14

IV.  PLAINTIFF'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW ...................... 15

     A.  Plaintiff Has Not Stated a Claim for Breach of Fiduciary Duty. .......................... 16

     B.  Plaintiff Has Not Stated a Claim for Waste of Corporate Assets ......................... 18

     C.  Plaintiff Has Not Stated a Claim for Unjust Enrichment ...................................... 19

     D.  Plaintiff Has Not Stated a Claim for Gross Mismanagement ................................ 20

CONCLUSION ........................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Abbott Labs. Deriv. S'holder Litig.*,
    325 F.3d 795 (7th Cir. 2003) ..................................................................9, 10

*Ashcroft v. Iqbal*,
    129 S.Ct. 1937 (2009).................................................................13, 16, 17

*In re Baxter Int'l Shareholder Litig.*,
    654 A.2d 1268 (Del. Ch. 1995).................................................................10

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................13, 16

*In re Bidz.com Inc. Deriv. Litig.*,
    2011 U.S. Dist. LEXIS 25260 (C.D. Cal. Feb. 24, 2011).........................10

*In re Boston Scientific Securities Litigation*,
    No. 1:10-cv-10593-PBS (D. Mass.)..........................................................3, 4

*Brehm v. Eisner*,
    746 A.2d 244 (Del 2000) ..........................................................................19

*In re Bridgeport Holdings, Inc.*,
    388 B.R. 548 (Bankr. D. Del. 2008) ..........................................................18

*Buckley v. O'Hanlon*,
    2007 U.S. Dist. LEXIS 22211 (D. Del. Mar. 28, 2007) ............................17

*In re Computer Scis. Corp. Deriv. Litig.*,
    2007 U.S. Dist. LEXIS 25414 (C.D. Cal. Mar. 26, 2007) ..........................5

*In re Dow Chemical Co. Deriv. Litig.*,
    2010 Del. Ch. LEXIS 2 (Del. Ch. Jan. 11, 2010) .....................................15

*Garza v. Belton*,
    2010 U.S. Dist. LEXIS 85828 (N.D. Ill. Aug. 13, 2010)...........................10

*Great Western Mining & Mineral Co., v. Fox Rothschild LLP*,
    615 F.3d 159 (3d Cir. 2010)......................................................................16

*Guttman v. Jen-Hsun Huang*,
    823 A.2d 492 (Del. Ch. 2003)....................................................................8

ME1 11486087v.4

*In re Intel Corp. Derivative Litig.*,
    621 F. Supp. 2d 165 (D. Del. 2009)............................................................9, 10, 14

*In re ITT Corp. Derivative Litig.*,
    653 F. Supp. 2d 453 (S.D.N.Y. 2009).................................................................8, 9

*Jackson Nat. Life Ins. Co. v. Kennedy*,
    741 A.2d 377 (Del. Ch. 1999)...............................................................................19

*In re Lear Corp. Shareholder Litig.*,
    967 A.2d 640 (Del. Ch. 2008)...............................................................................20

*Louisiana Munc. Police Employees Ret. Sys. v. Pandit*,
    2009 U.S. Dist. LEXIS 82308 (S.D.N.Y. Sept. 10, 2009)....................................5, 6

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004).....................................................................................2

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001) ...................................................................................20

*McSparran v. Larson*,
    2006 U.S. Dist. LEXIS 53773 (N.D. Ill. May 3, 2006) ........................................14

*In re Pfizer Inc. S'holder Deriv. Litig.*,
    722 F. Supp. 2d 453 (S.D.N.Y. 2010)...........................................................9, 10, 13

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Lundgren*,
    579 F. Supp. 2d 520 (S.D.N.Y. 2008)..............................................................5, 8

*Plymouth Cnty. Ret. Ass'n v. Schroeder*,
    576 F. Supp. 2d 360 (E.D.N.Y. 2008) .................................................................12

*Rabkin v. Philip A. Hunt Chem. Corp.*,
    498 A.2d 1099 (Del. 1985) ...................................................................................16

*Ryan v. Gifford*,
    918 A.2d 341 (Del. Ch. 2007).....................................................................11, 12, 13

*Sampson v. Robinson*,
    2008 U.S. Dist. LEXIS 63565 (S.D.N.Y. Aug. 20, 2008) ....................................10

*Tomczak v. Morton Thiokol, Inc.*,
    1990 Del. Ch. LEXIS 47 (Del. Ch. Apr. 5, 1990) ...............................................20

*In re Veeco Instruments, Inc. Secs. Litig.*,
    434 F. Supp. 2d 267 (S.D.N.Y. 2006)..................................................................12

ME1 11486087v.4

*Waber v. Dorman*,
  2011 U.S. Dist. LEXIS 19780 (N.D. Ill. Feb. 23, 2011) ........................................................10

*In re Walt Disney Co. Deriv. Litig.*,
  906 A.2d 27 (Del. 2006) ...........................................................................................................18

*Weiss v. Swanson*,
  948 A.2d 433 (Del. Ch. 2008)...................................................................................................18

*Zupnick v. Goizueta*,
  698 A.2d 384 (Del. Ch. 1997)...................................................................................................18

**OTHER AUTHORITIES**

Rule 8(a)........................................................................................................................................13

Rule 9(b) ..................................................................................................................................17, 18

Rule 12(b)(6) .............................................................................................................................4, 16

Rule 23.1 ..................................................................................................................................13, 15

iv

## INTRODUCTION

Nominal defendant Boston Scientific Corporation ("BSC") and the individual defendants named herein (the "Individual Defendants") respectfully submit this Reply Memorandum in support of *Defendants' Motion to Dismiss* the complaint in this action, as amended ("Amended Complaint" or "AC"),[1] and specifically in reply to *Plaintiff's Opposition to Defendants' Memorandum of Law in Support of Motion to Dismiss*, Docket No. 37 ("Pltff's Opp.").

## ARGUMENT

### I.   THE INFLAMMATORY ALLEGATIONS IN PLAINTIFF'S OPPOSITION ARE NOT SUPPORTED BY THE FACTS PLED IN THE AMENDED COMPLAINT OR THE PUBLIC RECORD

In an effort to distract attention from its failure to plead particularized *facts* in the Amended Complaint sufficient to establish demand futility, or to state viable legal claims against *any* of the Individual Defendants, the Pltff's Opp. indulges in wild and baseless accusations, *see, e.g.*, Pltff's Opp. at 3 ("defendants adopted an unlawful scheme to pay healthcare providers to boost sales"), *id*. at 17 ("defendants used…kickbacks to significantly increase sales"), which are *utterly unsupported* by the facts that are actually pled in the AC concerning what happened during "the period from April 20, 2009 to March 30, 2010 (the 'Relevant Period')." AC at ¶ 1.[2]

---

[1]   *See Verified Amended Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Gross Mismanagement*, filed herein on December 6, 2010 (Docket No. 27).

[2]   The relevant particularized facts pled in the AC are that at various times during the Relevant Period, the Company **(i)** received a subpoena from the Government seeking records pertaining to its charitable contributions to organizations with ties to doctors, **(ii)** terminated what the AC calls "numerous" employees, but which the public record shows were only 10 sales employees out of 1100 in its Cardiac Rhythm Management ("CRM") Group, for expense account ethics violations, **(iii)** signed a Corporate Integrity Agreement with the Government finally resolving a Government investigation into improper sale practices committed years earlier by a company that BSC now owns *before* that company was acquired by BSC, **(iv)** temporarily suspended sales of a line of CRM products when it was discovered that certain manufacturing process changes had not been submitted to the FDA for its approval (they were approved the following month), **(v)** expressed disagreement with a medical journal article suggesting that a BSC device had caused a particular patient incident, and **(vi)** made statements that the AC claims were misleading because they did not "disclose" that BSC was supposedly committing multiple illegal acts, a claim which *no particularized facts* pled in the AC supports. *See* AC. None of these allegations is legally sufficient to support a finding of demand futility.

The alleged fact that a number of BSC sales personnel were terminated for violation of BSC's expense policies concerning their sales and marketing efforts, for example, would not, even if true, support a finding that BSC's sales for any particular period were "inflated" by "illegal sales practices," *see* Pltff's Opp. at 5, 14, 28, 30, nor does the fact that in September 2009, BSC was subpoenaed to produce records pertaining to its contributions with charities having ties to medical doctors, support such a finding.   Similarly, BSC's December 2009 execution of a Corporate Integrity Agreement ("CIA") settling claims that **years earlier**, the salesforce of a company called Guidant had engaged in unlawful practices **before** being acquired by BSC - also does not support such a finding.

Moreover, careful examination of the record shows that in making its accusations, the Pltff's Opp. severely misstates the public record facts on which it purports to rely (of which the Court properly takes judicial notice on a motion to dismiss[3]).   It argues again and again, for example, that there were "numerous" terminations of key BSC sales employees in November and December of 2009, *see* Pltff's Opp. at 2, 19, when in fact **only nine (9) salepeople and one (1) regional sales manager** in BSC's Cardiac Rhythm Management ("CRM") group were terminated, out of a total of approximately 1,100 salespeople in that group during that period.

It also incorrectly asserts that on February 10, 2010, Defendants announced "that BSX was expected to lose up to $100 million in CRM sales due to the departure of a number of CRM sales personnel," *id*. at 10, when the undisputed public record shows that in fact, what Defendants said was that **the combination** of a December 2009 Product Advisory concerning an entire line of CRM products, as well as the termination of the 10 CRM Group sales employees, a number of whom had just been hired by a competitor, could result in a reduction of "up to" a

---

[3]   *See Lum v. Bank of Am.*, 361 F.3d 217, 221 n. 3 (3d Cir. 2004) (held that "matters of public record, and documents that form the basis of a claim" are considered on motion to dismiss).

ME1 11486087v.4

$100 million in revenues the following year.  *See In re Boston Scientific Securities Litigation*, No. 1:10-cv-10593-PBS (D. Mass.) at Dkt. No. 51, Exh. 3, p. COMDOC001742.

Pltff's Opp. also incorrectly asserts that BSC's public filings with the SEC evidence that

> the federal investigation by the U.S. Department of Health and Human Services ('HHS') which began in September 2009…culminat[ed] in…an extensive Corporate Integrity Agreement ("CIA") signed in December 2009,

Pltff's Opp. at 2, and that the CIA was entered into "as a result of" "the subpoena served on BSX in September 2009 by HHS."  *Id.* at 8.  These claims, however, are flatly contradicted by the very public documents submitted with Pltff's Opp. in ostensible support of them, which make clear that the Corporate Integrity Agreement that BSC signed with the Government in December 2009 was ***not*** related to the September 2009 HHS subpoena, or to any investigation of BSC's activities after its acquisition of Guidant, but rather was the culmination of the Government's investigation of certain activities at Guidant Corporation that occurred before BSC acquired Guidant in 2006.[4]

---

[4]  Pltffs' Opp. seriously misstates the public record on this point, erroneously arguing that

> [o]n December 22, 2009, <u>as a result of</u> the federal investigation into <u>whether</u> <u>BSX</u> essentially paid doctors to recommend (faulty) heart devices (which were later recalled) [referring to the 2005 investigation of Guidant activities], <u>and</u> <u>the subpoena served on BSX in September 2009 by HHS</u>, BSX entered into an extensive CIA designed to prevent further violations of the Anti-Kickback Statute, False Claims Act and other federal laws.  Ex. 1.

Pltffs' Opp. at p. 8 (emphasis added).  It cites "Ex. 1" to Pltffs' Opp. as the source for this claim, *id.*, but careful examination of that Ex. 1, which is a copy of BSC's Form 10-K filing for the year ending 2009, clearly shows that it does not at all support this claim, and instead confirms that ***the Corporate Integrity Agreement signed in December 2009 had <u>nothing</u> to do with prior BSX activities or the September 2009 HHS subpoena***, but rather related to ***an earlier 2005 subpoena***.

In this regard, Page 24 of the Form 10-K specifically states that "we recently entered into a civil settlement with the DOJ regarding the Department's investigation relating to certain post-market surveys conducted by Guidant Corporation ***before we acquired Guidant in 2006.*** As part of the settlement, we entered into a Corporate Integrity Agreement (CIA) with the Office of Inspector General for HHS." (emphasis added).  Page 131 of the 10-K then goes into more detail, explaining that it was a 2005 subpoena that prompted the investigation: "***In October 2005, Guidant received an administrative subpoena*** from the DOJ U.S. Attorney's office in Boston, issued under the Health Insurance Portability & Accountability Act of 1996. The subpoena requests documents concerning certain marketing practices for pacemakers, implantable cardioverter defibrillators, leads and related products ***arising prior to our acquisition of Guidant in 2006***.  In December 2009, Guidant settled this matter for $22 million and agreed to enter into a Corporate Integrity Agreement." (emphasis added).

The Pltff's Opp. perpetuates this error in other portions of its text,[5] even though the Plaintiff here has reason to be aware of the true public record facts because its co-counsel in this case was counsel for the original lead plaintiffs in the parallel securities fraud class action in Massachusetts,[6] until it withdrew from that case, after new lead plaintiffs were appointed there, and filed this shareholder derivative action here in Delaware.  In the Mass. action, which is now the subject of a motion to dismiss for failure to plead legally sufficient securities fraud claims, the pleadings extensively addressed the BSC securities filing referenced in Pltff's Opp. here, so their content is well-known, and as noted above, they do not show what Pltff's Opp. claims.

## II.   THE PLAINTIFFS' OPPOSITION DOES NOT PROPERLY DEFINE THE STANDARD FOR ESTABLISHING "DEMAND FUTILITY," AND RELIES ON SWEEPING CONCLUSIONS OF ILLEGALITY NOT SUPPORTED BY THE PARTICULARIZED FACTS PLED

Although Pltff's Opp. acknowledges the general rule that a derivative plaintiff, in order to survive a Rule 12(b)(6) and 23.1 motion to dismiss, must plead facts raising a "reasonable doubt" as to the independence and disinterestedness of a company's board of directors, it ignores

---

[5]   Pltff's Opp. makes the same misstatement of the public record in claiming, in its note 8, that

> the CIA resulted from…an investigation into similar post-acquisition [*i.e.* after BSC's acquisition of Guidant] and ongoing business activities that threatened BSX's current and future revenues and business reputation.  Ex. 1, Ex. 7; *see also* Ex. 8 …

Pltff's Opp. at 9, n. 8, when in fact, this is not true, and the referenced "exhibits" to Pltff's Opp. do not support this claim.  In this regard, Pltff's Opp. cites its own "Exs 1, 7 and 8" as support for the above-quoted claim, but Ex. 1 is BSC's 2009 Form 10-K which, as addressed in Footnote 4, *supra.*, gives no indication whatsoever that the December 2009 CIA had anything to do with current or post-Guidant acquisition BSC activities, and in fact makes clear that it related to "certain marketing practices…arising *prior to our acquisition of Guidant* in 2006." Ex. 1 at 131 (emphasis added).  Ex. 7 to Pltff's Opp., also cited in support, is the 12/23/09 BSC press release announcing the settlement and the CIA, which states only that "Boston Scientific Corporation (NYSE:BSX) today announced that it has entered into a civil settlement with the U.S. Department of Justice regarding the Department's investigation relating to certain post-market surveys *conducted by Guidant Corporation before the Boston Scientific acquired Guidant* in 2006." (emphasis added).  Ex. 8 to Pltff's Opp. is the press release related to another settlement reached by BSC with the U.S. Department of Justice stating that the settlement "related to product advisories *issued by our Guidant subsidiary in 2005*.  The alleged conduct and product sales occurred *prior to our 2006 acquisition of Guidant*." (emphasis added).  In short, none of the cited public record exhibits support this claim in Pltff's Opp.

[6]   *See In re Boston Scientific Securities Litigation*, Case No. 1:10-cv-10593-PBS (D. Mass.).

4

the plethora of federal court decisions *defining what that means*, which hold that the specific circumstances relied upon by the Plaintiff here as supposedly showing demand futility, such as that the directors serve on audit or quality control committees charged with preventing the alleged problems, and therefore supposedly face a "substantial likelihood" of liability, do ***not*** raise such a "reasonable doubt."   *See Louisiana Munc. Police Employees Ret. Sys. v. Pandit*, 2009 U.S. Dist. LEXIS 82308, at *33-34 (S.D.N.Y. Sept. 10, 2009) ("Insofar as plaintiff is alleging that these directors faced a substantial likelihood of personal liability based on their various Board committee memberships and position, their allegations are similarly inadequate. *Board committee membership, without more, cannot establish demand futility…Plaintiff's lengthy recitation of the duties and responsibilities* enumerated in those committees' charters *does **not** supply the requisite particularity*.")(emphasis added)(granting defendants' motion to dismiss shareholder derivative action).[7]

Pltff's Opp. then presents various conclusory arguments to the effect that demand on the BSC board of directors would have been futile because the majority of them face a "substantial likelihood" of liability for alleged illegalities *that the AC's particularized factual allegation*s, *see* Footnote 2, *supra*, even if assumed to be true, *simply do not establish*.  *See, e.g.*, Pltff's Opp. at 17 ("*It is inconceivable* that defendants could so ebulliently laud the Company's increased sales without any knowledge that those sales were driven by *unlawful payments to healthcare providers*"); *id.* at 28 ("*it is inconceivable* that the members of the Compliance and Quality

---

[7]   *Accord, In re Computer Scis. Corp. Deriv. Litig.*, 2007 U.S. Dist. LEXIS 25414, at *28-29 (C.D. Cal. Mar. 26, 2007) ("… *a conclusory assertion that … the Audit Committee members' fiduciary duties … required them to detect and report accounting errors…does not establish 'a substantial likelihood*' of their liability.") (applying Delaware law) (emphasis added); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Lundgren*, 579 F. Supp. 2d 520, 532 (S.D.N.Y. 2008) ("The Complaint does allege that members of the Audit Committee were responsible for 'reviewing and discussing…the Company's earnings, press releases,…financial information and earnings guidance…and…disclosure and internal controls' and 'participated in wrongdoing' by preparing or failing to correct the allegedly false statements at issue…However, these general allegations, *based simply on the fact that a defendant was a member of a board or committee*, without more, *are insufficient as a matter of law* [to demonstrate demand futility].")(emphasis added).

5

Committee could have acted in accordance with these duties in good faith and not have known of the product defect … and the lack of FDA approvals"); *id*. at 19 ("*it can reasonably be inferred that the Director Defendants, at a minimum, knew of a high probability that BSX's dramatic increase in sales in 2009 was due in large part to the widespread use of unlawful payments to providers.*") (emphasis added).

In this regard, the particularized allegations of fact in the AC, *see* Footnote 2, *supra*, *simply are not sufficient*, using the stringent standards for pleading "demand futility" derivative actions established in the relevant caselaw, to support the oft-repeated conclusions in Pltff's Opp. that "BSX's dramatic increase in sales in 2009 was due in large part to the widespread use of unlawful payments to providers," Pltff's Opp. at 19; that "sales were driven by unlawful payments to healthcare providers," *id*. at 17; that "defendants adopted an unlawful scheme to pay healthcare providers to boost sales," *id*. at 3; that "defendants used…kickbacks to significantly increase sales", *id*. at 17; and that "defendants…authorized…use [of] company money to bribe healthcare professionals into recommending the purchase of CRM devices." *Id*. at 23.

In fact, except for Individual Defendants Elliott and Leno (and Leno is not a director of BSC), who are alleged to have made purportedly misleading statements, *none* of the Individual Defendants are the subject of *any* particularized factual allegations in the AC *other than* that they were members of BSC committees charged with certain responsibilities in connection with the management of the Company during the period when BSC was dealing with a series of legal, regulatory, and market issues -- a fact on which Pltff's Opp. heavily relies,[8] but which is insufficient as a matter of law to establish demand futility. *See* p. 5, *supra*.

---

[8]   *See* Pltff's Opp. at 17-18 ("Director Defendants Mario and Reinhardt served on the Audit Committee…[and] Director Defendants Mario, Reinhardt, Fox, Connors, and Sununu served on the Compliance Quality Committee…making it…unbelievable that they were somehow unaware of the alleged misconduct.").

There are no allegations in Pltff's Opp. or the AC, for example, that any BSC directors had any particular motive for, or received any unique financial benefits as a direct result of, any of the alleged misstatements, illegal conduct, or supervisory failures cited in the AC -- *e.g.* there are no claims of opportunistic insider stock trading, improper backdating of stock options, unfair compensation arrangements, or improper self-dealing or impropriety of any kind by any individual BSC directors.   Nor are there any allegations that any BSC director(s) were given specific prior notice that any particular improper conduct or defective product sales were going to occur, and failed to take appropriate action.[9]

Instead, the Pltffs' Opp. argues that investigations from many years earlier, dealing with different problems than what the AC claims the BSC directors should have prevented here, show that those directors, because of their positions at BSC, "must" have known enough to have prevented the problems that came to light during the relevant 2009-2010 time period cited in the AC.  *See, e.g,* Pltffs' Opp. at 28.   This type of argument is classically insufficient to show demand futility, however.   Specific particularized facts must be pled, against a majority of the individual directors, that satisfy the stringent requirements for establishing demand futility.

## III.  THE PLAINTIFFS' OPPOSITION DOES NOT IDENTIFY SUFFICIENT PARTICULARIZED FACTS IN THE AMENDED COMPLAINT TO SATISFY THE STRINGENT REQUIREMENTS FOR PLEADING "DEMAND FUTILITY"

In this regard, the parties agree that in order to survive the Defendants' Motion to Dismiss, the AC must contain particularized allegations sufficient to establish, under the relevant caselaw, that at least six (6) of the twelve (12) Boston Scientific Board members were not independent and disinterested at the time this action was commenced.   *See* Pltff's Opp. at 3.

---

[9]     Nor are there any allegations that the BSC directors failed to institute basic controls, such as audit and quality committees and codes of ethics, or failed to conduct internal investigations when warranted.   ***In fact, the AC alleges just the opposite*** -- that the Company had audit and quality control committees, entered into affirmative agreements with the Government to prevent a repetition of the problems that had arisen with the Guidant sales force, and investigated and terminated sales personnel who failed to comply with its code of ethics.  *See* AC.

7

Pltff's Opp. alleges that the Plaintiff has met this burden with regard to the following six (6) BSC board members: J. Raymond Elliott ("Elliott"); Ernest Mario ("Mario"), Uwe E. Reinhardt ("Reinhardt"), Nelda J. Connors ("Connors"), Marye Ann Fox ("Fox"), and John E. Sununu ("Sununu"). With the exception of Elliott, however, no particularized allegations are made against any of these board members. Rather, Pltff's Opp. attempts to show that these directors, other than Elliott, were not independent and disinterested because **(1)** Mario and Reinhardt were "Audit Committee Members" with a "role in supervising legal and regulatory compliance," during the Relevant Period, see Pltff's Opp. at 24-25, and **(2)** Connors, Fox, and Sununu (along with Mario and Reinhardt) were "Compliance and Quality Committee" Members during the Relevant Period," with responsibility to "monitor and evaluate the Company's quality compliance and quality assurance systems and initiatives." See Pltff's Opp. at 27.

It is well-settled, however, that these kinds of "general allegations, based simply on the fact that a defendant was a member of a board or committee, are insufficient as a matter of law" to establish that a director is not independent and disinterested. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Lundgren*, 579 F. Supp. 2d 520, 532 (S.D.N.Y. 2009). *See also In re ITT Corp. Derivative Litig.*, 653 F. Supp. 2d 453, 464 (S.D.N.Y. 2009). Rather, what is required is specific allegations showing that the members of a particular committee were actually made aware of a particular problem which they knowingly failed to address. *Pirelli*, at 532-33 ("Though the Complaint contains some detail regarding the alleged responsibilities of the Audit Committee, it includes no particular allegation regarding the nature of the adverse non-public information Plaintiff believes would subject these defendants to a substantial likelihood of liability."). *See also Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 493-94 (Del. Ch. 2003) (noting that the complaint must allege "real facts").

8

Pltff's Opp. tries to argue that the AC has satisfied this requirement inferentially by relying on two distinguishable cases from outside this Circuit, *In re Abbott Labs. Deriv. S'holder Litig.*, 325 F.3d 795 (7th Cir. 2003),[10] and *In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010).[11] *Abbott Labs* and *Pfizer*, however, in addition to not being binding on this Court,[12] involved very unusual and egregious facts, *see* Footnotes 10-11, *below*, and numerous courts have rejected the efforts of derivative plaintiffs to plead these cases as grounds for their demand futility arguments where, as here, such facts are not present. *See In re ITT Corp.*, 653 F. Supp. 2d at 464 n. 6 ("Unlike in *Abbott Laboratories*,…where numerous specific factual allegations showed that the directors were aware of illegal conduct…there are no specific allegations demonstrating Defendants[']…knowledge of misconduct or conscious inaction in the

---

[10]   *Abbott Labs* involved shareholder derivative claims filed after a six-year investigation into Abbott's failure to follow "Current Good Manufacturing Practice" ("CGMP") requirements for its *in vitro* diagnostic products. In that case, "the FDA conducted thirteen separate inspections of Abbott's…facilities" (some lasting for two months or longer) during a six-year period and sent the company numerous notifications and Certified Warning Letters detailing the company's failure to follow CGMP, many of which were copied to the company's chairman of the board of directors. *Abbott Labs.*, 325 F.3d at 799. Based on these facts, including the numerous letters sent to the Board detailing the CGMP problems, public news reports, and SEC disclosures signed by the board acknowledging the company's non-compliance, the court held that sufficient facts were alleged establishing that the board was on-notice of the specific CGMP problems in issue, *id.* at 806, and ultimately held that the existence of "continuing violations" of these specific federal regulations "over a period of six years," which the board was repeatedly informed about, and which the board "took no steps in an effort to prevent or remedy," was sufficient to state a claim for a "sustained and systematic failure of the board to exercise oversight." *Id.* at 808-09. Nothing like that is alleged in the AC here, however.

[11]   *Pfizer* involved allegations of a long-term scheme to promote the "off-label" marketing of Pfizer's products, despite Pfizer's awareness of the need to prevent such practices following several government settlements it and its subsidiaries had entered into. The court, after noting that "[i]n the face of all these prior violations by its subsequently-acquired subsidiaries, and despite its promises to take significant steps to monitor and prevent any further violations, Pfizer itself engaged in the same misconduct" (i.e., promoting off-label uses for Pfizer drugs), and that "Pfizer's board and senior management, rather than attempting to stop this off-label promotional activities, retaliated against employees who reported internally that Pfizer's marketing practices were illegal," *Pfizer Inc.*, 722 F. Supp. 2d at 456, thereby resulting in a \$2.3 billion Department of Justice settlement, *id.* at 454, found demand excused, given the "substantial 'magnitude and duration,'" of the problem, *id.* at 460, and the "large number of reports made to members of the board from which it may reasonably be inferred that they all knew of Pfizer's continued misconduct and chose to disregard it." *Id.* Again, nothing like that is alleged in the AC here.

[12]   *Cf. In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 176 (D. Del. 2009) ("None of the four cases relied upon by Plaintiff [including *Abbot Labs*] to argue that the directors face a 'substantial likelihood' of liability are from Delaware courts. Thus, as authority for the Court to rely upon in forming its decisions in this case, the cited cases ***are not persuasive***.") (emphasis added).

9

face of that knowledge. Accordingly, a substantial likelihood of liability will not be inferred from these Directors' service on committees of the Board."); *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 176-177 (D. Del. 2009) ("[T]he alleged wrongdoing by Intel in this case does not rise to the *Abbott* level of wrongdoing.").  *See also In re Bidz.com Inc. Deriv. Litig.*, 2011 U.S. Dist. LEXIS 25260 (C.D. Cal. Feb. 24, 2011) (granting motion to dismiss without leave to amend, rejecting attempt to state an *Abbott Labs* and *Pfizer* claim); *Waber v. Dorman*, 2011 U.S. Dist. LEXIS 19780 (N.D. Ill. Feb. 23, 2011) (same).[13]  The same result is warranted here.  *See In re Baxter Int'l Shareholders Litig.*, 654 A.2d 1268, 1271 (Del. Ch. 1995) (plaintiff's complaint failed to show "circumstances…so egregious that there is a substantial likelihood of liability.").

### A. The Amended Complaint Lacks Particularized Allegations Showing That The Audit Committee Members Are Not Independent and Disinterested

Unless the factual allegations of the AC establish that the BSC Audit Committee Members face a "substantial likelihood of liability," Plaintiff will have failed to show that six of twelve directors were not independent and disinterested at the time the AC was filed.  Thus, it is useful to examine their situation first.  Pltff's Opp. argues that the BSC Audit Committee Defendants (identified as defendants Mario and Reinhardt) are not disinterested – and that making demand on them would therefore be futile – because they face a "substantial likelihood

---

[13]   *See also Sampson v. Robinson*, 2008 U.S. Dist. LEXIS 63565, at *20-21 (S.D.N.Y. Aug. 20, 2008) ("*Abbott Labs*…is clearly distinguishable. The Abbott board members received numerous, written 'red flags' and 'storm warnings,' attended several meetings with regulators where they were briefed on the company's problems, and were aware of the company's total and complete regulatory non-compliance for six years, and still did nothing. While the Bristol-Myers Board was aware of prior misconduct, it took affirmative steps to address the concerns of the regulatory agencies. The Defendants entered into a Consent Decree requiring regulatory approval of settlements; appointed a federal monitor; submitted to regulatory oversight; and consulted outside counsel. These actions reflect a desire to comply with the regulatory scheme, not as in *Abbott Labs*, an attempt to avoid or ignore regulatory concerns."); *Garza v. Belton*, 2010 U.S. Dist. LEXIS 85828, at *28 (N.D. Ill. Aug. 13, 2010) ("[T]he *Abbott* court never held that allegations of a corporate governance procedure, without specific allegations of notice like those present in *Abbott*, would suffice to plead 'conscious inaction.' And even if such an allegation were sufficient, Garza has failed to make such allegations here with the requisite particularity. The allegation that the Audit Committee's charter necessarily resulted in the Audit Committee Defendants' and other Individual Defendants' knowledge of the improper accounting procedures lacks any factual supporting detail, such as when and how defendants learned of the improper accounting procedures.").

10

of liability for recommending the filing of false and/or misleading information with the SEC and failing to ensure the integrity of the company's internal disclosure controls." Pltff's Opp. at 24-25. Pltffs' Opp. points to no particularized factual allegations in the AC concerning any such "recommendations" by the Audit Committee to file false or misleading information, however. Instead, it relies solely on conclusory arguments that the Audit Committee's Charter "obligated them to maintain adequate internal controls over financial reporting and the integrity of the Company's financial statements." Pltffs' Opp. at 24. These arguments, however, are entitled to no weight where, as here, there are no particularized allegations in the AC explaining how, if at all, the Audit Committee did not "maintain" such controls, particularly where in fact, it appears from the allegations in the AC that they did. *See* Footnote 9, *supra*.

Pltffs' Opp. also argues, at p. 25, that the two Audit Committee Members "were aware" that BSC's sales increases in sales "were due to illegal financial inducements paid to healthcare providers" and that there would be "a significant likelihood of lower sales numbers" after "the investigation and termination" of CRM group sales personnel, but it cannot point to any particularized factual allegations in the AC showing **(1)** that in fact there were any "illegal financial inducements paid to healthcare providers" during the Relevant Period, or **(2)** how, if at all, and when, the Audit Committee Members were made aware of them, and **(3)** when they allegedly should have been disclosed. Absent such particulars, these conclusory assertions are similarly entitled to no weight in evaluating, in the context of motion to dismiss, whether a case of genuine "demand futility" has been pled.

In this regard, the case cited at pp. 25-26 of Pltff's Opp., *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007), does not support its claim that the Audit Committee Members face a substantial likelihood of liability – in fact, the quoted language from the *Ryan* case is taken completely out

of context.  Pltff's Opp. at 26.  In *Ryan*, the Delaware Chancery Court found that demand was futile under the "unique facts" of a stock option backdating scheme orchestrated by the Board, where the plaintiff's complaint presented particularized factual allegations showing that certain option grants were "suspicious[ly] tim[ed]," and that, in granting options, the Board had "ignore[d] limitations set out in the company's stock option plans."  918 A.2d at 354-55. Because the plaintiff "point[ed] to specific grants, specific language in option plans, specific public disclosure, and supporting empirical analysis to allege knowing and purposeful violation of shareholder plans and intentionally fraudulent public disclosures," demand was deemed futile. *Id.*  It is in that context that the *Ryan* court held that stock option backdating in particular – not "false and misleading statements" generally, as Pltff's Opp. mistakenly claims – "runs afoul of many state and federal" laws and statutes, and may provide a basis for a finding of demand futility.  *Id.* at 345.  That is obviously not the situation here.

Other authorities cited in Pltff's Opp. dealt with similarly distinguishable situations in which particularized facts showing willful misconduct were pled.[14]  Again, this is not the situation here.  In fact, the allegations pled in the AC itself show that Boston Scientific very actively sought to prevent and then address the employee ethics issue at issue in this case.  First, as the AC acknowledges, BSC had entered into a strict Code of Ethics through the Advanced Medical Technology Association.  AC ¶¶ 77-79.  Additionally, as explained in ¶ 8 of the AC, in August 2009 the Company began an "extensive" investigation of CRM sales employee practices,

---

[14]    In *In re Veeco Instruments, Inc. Secs. Litig.*, 434 F. Supp. 2d 267, 277-78 (S.D.N.Y. 2006), particularized allegations that a reduction of the company's accounting staff from 8 to 2 employees "materially weakened" internal controls and "fostered an environment" that permitted the company to conceal a number of alleged accounting improprieties, along with allegations that the Board ignored for seven months internal reports that the company had violated export laws, were sufficient inaction by the Board in the face of "red flags" to render demand a futility.  In *Plymouth Cnty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360 (E.D.N.Y. 2008), the court applied New York demand futility law (not Delaware's, as Plaintiff suggests) and found that the complaint had alleged sufficient particularized allegations of stock option backdating, which greatly benefited the Board members personally to the detriment of shareholders. *Id.* at 369-70.

resulting in the termination of certain CRM sales employees.  *Id.* ¶ 8.  The Company also entered

into a Corporate Integrity Agreement in December 23, 2009, and, unlike in *Pfizer* where the

company entered into three separate CIA's over the course of several years and then used the

CIA's "as camouflage" to cover up future misconduct, *Pfizer*, 722 F. Supp. 2d at 459, here there

is no suggestion that Boston Scientific did not abide by the CIA (which post-dates the employee

misconduct at issue).  Pltff's Opp. at 2.  Moreover, both the employee investigation and the CIA

show that the Company did not sit idly by and permit illegal conduct to occur, but rather sought

to prevent that conduct, and took decisive action when the conduct was revealed.  These facts,

which actually are pled in the AC, would militate against a finding of demand futility even if

facts sufficient to support such a finding had been pled in the AC (which they were not).

### B.    The AC Lacks the Requisite Particularized Allegations Showing That The CQ Committee Members Are Not Independent and Disinterested

As to the Compliance and Quality Committee Members, Pltffs' Opp. argues that, "[i]n

light of the internal controls" the Company had in place, "*it is inconceivable* that the members of

the Compliance and Quality [CQ] Committee could have acted in accordance with" their duties

and "*not have known* of the product defect . . . and the lack of FCA approvals," which ultimately

resulted in a product recall.  Pltff's Opp. at 28 (emphasis added).  This kind of conclusory

supposition -- that it is "inconceivable" that a party could "not have known" something because

of prior events -- is insufficient pleading even under Rule 8(a) and the standards required by *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009).

Under the more stringent requirements of Rule 23.1 applicable here, it is plainly inadequate, and

cannot support a finding of demand futility against the CQ Committee Members.

Moreover, in a huge corporation like BSC, the law does not presume that the directors,

merely through membership on committees such the CQ Committee, will be able to uncover and

prevent all problems before they occur, nor does the fact that many issues arise and need to be investigated and addressed mean that the directors face a "substantial likelihood of liability" that would make any demand for relief made on them futile -- but that is essentially what Pltff's Opp. is arguing.  In this respect, the arguments in Pltffs' Opp. are similar in approach to those of the plaintiff in *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165 (D. Del. 2009), where the court observed that:

> Plaintiff's approach is little more than to catalog the ongoing investigations into Intel's alleged wrongdoing, ***and then assert that the thickness of the catalog demonstrates*** that Intel's conduct was so egregious and widespread ***that the Directors certainly must now face at least a substantial likelihood of personal liability*** … ***However***, setting aside Plaintiff's failure to allege facts suggesting that Defendants knew they were not discharging their duties, ***the Court is unable to conclude*** that the alleged "red flags" are so compelling ***that the Defendants now face a "substantial likelihood" of liability***.

*Id.* at 175 (emphasis added).  As one federal court observed in dismissing a derivative claim based on such a similar argument:

> To allow such claims to give rise to demand futility ***would significantly diminish the protections of the demand requirement*** for all large corporations, which are likely to have several lawsuits and employee claims pending at any given time. ***Not every lawsuit*** means a board was negligent in its oversight and ***not every government investigation*** means a company's board ***must relinquish control*** over litigation on behalf of the corporation.

*McSparran v. Larson*, 2006 U.S. Dist. LEXIS 53773, at *16 (N.D. Ill. May 3, 2006)(emphasis added).  The same reasoning applies here, because there are no particularized facts alleged in the AC that would support a conclusion that the CQ Committee Members face a "substantial likelihood of liability" for anything, and the arguments in Pltffs' Opp. do not change that.

### C.    The AC Lacks the Requisite Allegations Showing That J. Raymond Elliott Is Not Disinterested and Independent

To the extent the Plaintiff persists in its claim that defendant Elliott faces a "substantial likelihood of liability" for making or allowing alleged misleading public statements, the

14

Defendants have already addressed that in their initial brief.  *See* Deft's Mem. at 17-20.  As to these public statements, Delaware law is clear that in order to find that an officer's or director's statements were made with the requisite knowledge or bad faith to support an inference that he or she faces a "substantial likelihood" of liability, "an analysis of the state of mind of the individual director defendants" is required to be demonstrated by means of particularized allegations.  *In re Dow Chemical Co. Deriv. Litig.*, 2010 Del. Ch. LEXIS 2, at *39-40 (Del. Ch. Jan. 11, 2010) Pltff's Opp. does not deny this,[15] and since the AC pleads no such particularized facts with respect to Mr. Elliott, a finding of demand futility for him based on his statements is not possible.

However, in possibly the largest inferential leap the Court is asked to make, Pltffs' Opp. argues that an investigation and government settlement at Zimmer Holdings, Inc. – a company where defendant Elliott had been an officer prior to serving as an officer at BSC – demonstrates that Elliott was aware of the allegedly unlawful conduct at BSC that the AC claims (albeit without pleading particularized facts).  *See* Pltff's Opp. at 18 ("[i]t is completely implausible that, having come to BSX with this experience [from Zimmer Holdings], Elliott would have been unaware of precisely the same unlawful conduct at BSX").  Again, however, Pltffs' Opp. points to no particularized facts in the AC showing ***how*** Elliott knew of the specific CRM sales practices at issue during the Relevant Period, and such particularized allegations are required under Rule 23.1 before this claim can be given any weight on a motion to dismiss.

## IV.    PLAINTIFF'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW

Even were Plaintiff to overcome the fact that it has not pled legally sufficient particularized facts to support a finding of demand futility, this action could not properly proceed because its substantive allegations fail to state valid legal claims against these Defendants under

---

[15]    Plaintiff's Opposition does not address *Dow Chemical*, and only addresses *In re Citigroup* in cursory and unavailing terms.  *See* Pltff's Opp. fn. 17.

Delaware law.  In this regard, the standard on a Rule 12(b)(6) motion advocated by Plaintiff –

that a party is entitled to dismissal "only where it is clear from the allegations that the plaintiff

would not be entitled to relief under any set of facts that could be proved," Pltff's Opp. at 29[16] –

is the disfavored *Conley* test which is no longer used following the Supreme Court's recent

decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S.

Ct. 1937 (2009).  Under these decisions, as the Third Circuit has recently emphasized, a plaintiff

must make a "'showing,' rather than a blanket assertion of entitlement to relief," and has an

obligation "to provide the 'grounds' of his 'entitle[ment] to relief' ... more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"  *Great*

*Western Mining & Mineral Co., v. Fox Rothschild LLP*, 615 F.3d 159, 176 (3d Cir. 2010)

(citations omitted).    Under  the  new  standard,  courts  are  required  to  reject  "conclusory"

allegations,  and  rely  only  on  "'***facts*** suggestive  of  [the  proscribed]  conduct.'"    *Id.* at 177

(emphasis added) (dismissing claims based on conclusory allegations such as "[d]efendants

engaged in a concerted action of a kind not likely to occur in the absence of agreement").  In

overlooking the new, tighter standards of *Twombly* and *Iqbal* which the Third Circuit requires,

the Pltffs' Opp. highlights a serious problem with the Plaintiff's substantive claims, which, as

explained below, fail to state valid legal claims under the applicable Delaware law.

### A.    Plaintiff Has Not Stated a Claim for Breach of Fiduciary Duty

Pltff's Opp. argues that the "core theory of the Complaint rests on the *conscious and*

*deliberate acts of misconduct* by defendants," including the Board's "allow[ing] BSX's CRM

sales force to engage in an improper kickback scheme . . [and] disseminat[ing] numerous

misleading statements that covered up this misconduct and the devastating impact" to BSX's

---

[16]    Plaintiffs have cited *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099 (Del. 1985) as the applicable
standard for evaluating claims on a motion to dismiss under Rule 12(b)(6).  That twenty-five year old decision
is no longer favored given the Supreme Court's recent holdings in *Twombley* and *Iqbal*.

ME1 11486087v.4

business.  Pltff's Opp. at 30 (emphasis supplied).  Attempting to sidestep the defects in the *Caremark* claims pled in the AC, Pltff's Opp. inexplicably raises Plaintiff's burden further by claiming that Defendants' alleged public misstatements were "deliberate" or "conscious" – though its fails to identify *any* particularized facts pled in the AC demonstrating *any* intent or knowledge on the part of the Board, or *any* particularized facts supporting the claim that the Board "allowed" or caused such wrongdoing to occur.  This is precisely the type of conclusory pleading which *Twombley* and *Iqbal* have held is no longer legally sufficient.

In addition, since Plaintiff is essentially alleging that Defendants committed an intentional fraud on BSC's shareholders by making public misstatements, the heightened pleading standards of Rule 9(b) must also be met,[17] and in the AC here, they are not.  In particular, Plaintiff has not made even a minimal showing that the Board consciously ignored "red flags," failed to exercise its duties once known risks were brought to its attention,[18] or had a duty to disclose publicly what it allegedly failed to disclose.[19]  *See* Defendants' Memorandum of Law in Support of Motion to Dismiss, Dkt. No. 33 herein ("Defts' Mem.") at 27-29.  Thus, it has no claim for breach of fiduciary duty against any Defendant.

---

[17]  This Court has held that the particularity requirement of Fed. R. Civ. P. 9(b) may apply "when the allegations of breach of fiduciary duty sound in fraud." *Buckley v. O'Hanlon*, 2007 U.S. Dist. LEXIS 22211, at *13 (D. Del. Mar. 28, 2007).  While allegations there that defendant directors "knew or should have known" were insufficient to require particularity under Rule 9(b), it may be that the Board's actions which are alleged here as being "deliberate and conscious" – though conclusory – sound in the type of fraud alluded to by *Buckley* and therefore are required to be plead with particularity.

[18]  In fact, as pled, Plaintiff's AC demonstrates that BSC hired a third party to investigate its CRM sales practices in August 2009, culminating in the termination of ten sales employees in December 2009.  Defts' Mem. at 28.  Also in December 2009, BSC entered into an extensive Corporate Integrity Agreement to "prevent further violations."  *Id.*  Even under the theory advanced by Plaintiff, the Defendants were not ignoring their obligations but were acting proactively.

[19]  Only two defendants in this case – Elliott (President/CEO and board member) and Leno (officer) – are defendants in the federal securities class action pending in Massachusetts federal court, and therefore it cannot be said a majority of the Board faces a "substantial likelihood of personal liability" for making allegedly fraudulent public statements to shareholders.  A motion to dismiss in that case is briefed and oral argument is pending.  Significantly, Plaintiff has not articulated how any of the Defendants' alleged public misstatements imposed a duty to disclose further information.

### B.      Plaintiff Has Not Stated a Claim for Waste of Corporate Assets

While Plaintiff agrees that a claim of corporate waste under Delaware law lies only where "no person of ordinary sound business judgment would say that the consideration received [by the corporation] . . . was a fair exchange for [consideration given]," Pltff's Opp. at 31, it claims that the Court need not determine the question of adequate consideration at the motion to dismiss stage.  *Id.*  It relies for this proposition, however, on a 2007 decision by the Delaware bankruptcy court which, the following year, dismissed a claim for corporate waste at the motion to dismiss precisely because the consideration alleged was adequate and did not present the scenario of "'an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation'" did not receive adequate consideration.  *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 576 (Bankr. D. Del. 2008) (quoting citation omitted).

"Only extraordinary circumstances can justify a finding of waste," *id.* at 577, and such circumstances are reserved for the "'unconscionable case where directors irrationally squander of give away corporate assets.'"  *Id.* (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006)).  The test for corporate waste is an "extreme test, very rarely satisfied by shareholder plaintiff." *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008) (quoting *Zupnick v. Goizueta*, 698 A.2d 384, 387 (Del. Ch. 1997)).[20]  Plaintiff's general allegations that Defendants "fail[ed] to properly consider the interests" of BSX "by refusing to conduct proper supervision" are far from the type of "rare" or "unconscionable" conduct contemplated by Delaware's high standard for proving corporate waste.  For these reasons and those stated in Defendants' initial

---

[20]   Waste has been described as "an exchange of corporate assets for consideration so disproportionally [sic] small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose." *Weiss*, 948 A.2d at 450 (citing *Brehm v. Eisner*, 746 A.2d 244, 263 (Del 2000)).

ME1 11486087v.4

memorandum supporting dismissal, Count II does not state a valid legal claims, and should be dismissed for that reason.  *See also* Defts' Mem. at 29-30.

### C.      Plaintiff Has Not Stated a Claim for Unjust Enrichment

In defending their claim for unjust enrichment, Plaintiff baldly asserts that the claim should survive dismissal because "defendants received millions of dollars in undeserved compensation, bonuses and benefits while knowingly breaching their fiduciary duties."  Pltff's Op. at 32.  Plaintiff states nothing specific, however, as to how the compensation – which they do not claim is outside the compensation normally provided to officers and Board members of similar companies – is "undeserved," and it instead relies on its general and conclusory allegations that the Defendants "knowingly" breached their duties, which are unavailing for the reasons already stated in the preceding section.

Though Plaintiff claims that a Delaware action for unjust enrichment has "only two elements," it ignores Delaware law cited by Defendants, which lists *five* elements a plaintiff must allege and prove.  *See* Defts' Mem. at 31 (citing *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999)).  Plaintiff therefore does not even address the fact that they have not plead an "absence of a remedy provided by law," and "absence of justification," an "impoverishment" to the Company, or any causal connection between the impoverishment and the enrichment.  Defts' Mem. at 32-33.  Furthermore, although it argues that *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) is "inapposite" because the compensation package in *Brehm* was not the result of "fraudulent or illegal activity," Pltffs' Opp. does nothing to causally link the alleged wrongdoing with any unjust increase in any of the Defendants' individual compensation situations, which is essential to state a valid claim.

In this regard, it is well-settled that he "size and structure of executive compensation are inherently matters of judgment" for the board, *Brehm*, 746 A.2d at 263, and simply asserting

alleged corporate wrongdoing alongside a cursory description of what a company pays it officers and directors does not make out a claim for unjust enrichment.  This, combined with the fact that Plaintiff has not plead all of the essential elements of this claim, warrants dismissal of Count III.

### D.   Plaintiff Has Not Stated a Claim for Gross Mismanagement

To defend its claim for "gross mismanagement" (which is essentially a repetition of the claim breach of fiduciary duty on the basis of alleged gross negligence), Plaintiff falls back again on its general assertions that "defendants allowed BSX to disseminate a series of misleading statements concerning the company's business practices" and other issues, and "authorized and/or consciously allowed widespread illegal kickbacks to boost sales."  Pltff's Opp. at 34. Such conclusory allegations do not rise to the level of "reckless indifference to or ... deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason" which Delaware law requires to maintain this claim.  *Tomczak v. Morton Thiokol, Inc.*, 1990 Del. Ch. LEXIS 47, at *35 (Del. Ch. Apr. 5, 1990) (citations omitted).

Pltff's Opp. also does not address the fact that the definition of gross negligence as used in Delaware corporate law "is extremely stringent,"  *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008), nor does it dispute the fact that BSC's exculpatory provision precludes such claims against officers and directors.  *See* Defts' Mem. at 34 (citing *Malpiede v. Townso*n, 780 A.2d 1075, 1094-95 (Del. 2001)).  In short, Pltff's Opp. points to no law, and no allegations in the AC, that can save Plaintiff's claim for "gross mismanagement."  As a result, this claim also should be properly dismissed.

### CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in Defts' Mem. (Dkt. No. 33), this action should be properly dismissed with prejudice.

ME1 11486087v.4

Respectfully submitted,

MCCARTER & ENGLISH, LLP

By:    */s/ Daniel M. Silver*
        Michael P. Kelly, Esq. (#2295)
        Daniel M. Silver, Esq. (#4758)
        405 N. King Street 8th Floor
        Wilmington, DE 19801
        Tel: 302-984-6300
        Fax: 302-984-6399
        mkelly@mccarter.com
        dsilver@mccarter.com

        Robert J. Kaler, Esq. (*Pro Hac Vice*)
        Edward W. Little, Jr., Esq.
        David Himelfarb, Esq.
        McCarter & English LLP
        265 Franklin Street
        Boston, MA 02110
        Tel. 617-449-6507
        rkaler@mccarter.com
        elittle@mccarter.com
        dhimelfarb@mccarter.com

        *Attorneys for Defendants*

Dated:  April 13, 2011