

September 1, 2011

**VIA CM/ECF & HAND DELIVERY**

The Honorable Sue L. Robinson
United States District Court for the District of Delaware
844 North King Street, Room 4209, Unit 31
Wilmington, DE 19801

**Re:    *Iron Workers District Council, et al. v. J. Raymond Elliott, et al.*, Civil Action No. 1:10-cv-00699-SLR**

Michael P. Kelly
Partner
T. 302.984.6301
F. 302.984.2493
mkelly@mccarter.com

Dear Judge Robinson:

Pursuant to Local Rule 7.1.2, nominal party Boston Scientific Corporation and the individual defendants in the above-referenced action respectfully submit herewith, as supplemental authority, the attached *Report and Recommendation on Defendants' Motion to Dismiss*, dated August 31, 2011, which has just been issued in a related shareholder derivative action substantially similar to this one now pending in the United States District Court for the District of Massachusetts, entitled *Rick Barrington, derivatively on behalf of Boston Scientific Corp. v. John E. Abele, et al.*, Civil Action No. 10-11054-NMG (D. Mass.), in which the plaintiff's allegations, like those of the plaintiff in this case, are substantially based on the allegations in the purported securities fraud class action now pending in Massachusetts, entitled *In re Boston Scientific Securities Litigation*, Case No. 1:10-cv-10593, which is referenced in Defendants' Memorandum of Law in Support of Motion to Dismiss in this case (Docket no. 33), at p. 2, footnote 4.

McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801-3717
T. 302.984.6300
F. 302.984.6399
www.mccarter.com

Respectfully submitted,

BOSTON

*/s/ Michael P. Kelly*

HARTFORD

Michael P. Kelly (#2295)

NEW YORK

Enclosure

NEWARK

cc: Joel Friedlander, Esq. (Via CM/ECF)
Travis E. Downs III, Esq. (Via CM/ECF)
All Counsel appearing on CM/ECF

PHILADELPHIA

STAMFORD

WILMINGTON

ME1 12219036v.1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICK BARRINGTON, derivatively, on behalf of nominal defendant Boston Scientific Corp., <br><br> Plaintiff, <br><br> v. <br><br> JOHN E. ABELE, et al., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No. 10-11054-NMG |

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION TO DISMISS

August 31, 2011

SOROKIN, M.J.

Pending is the Defendants' Motion to Dismiss. Docket # 8. For the following reasons, I
RECOMMEND that the Court ALLOW the Defendants' motion.

I.      PROCEDURAL AND FACTUAL BACKGROUND

In this shareholder derivative suit brought on behalf of Boston Scientific Corporation (the
Company), a Delaware corporation, the Plaintiff alleges that the Company's current directors,
certain former directors, and certain current and former officers breached their fiduciary duties
and caused substantial losses to the Company between April 20, 2009, and March 12, 2010, by
approving (or acquiescing in) a course of misconduct which includes: illegal and unethical
business practices; the manufacturing, marketing and selling of defective products; and,

1

concealment of these wrongful actions from investors. Docket # 1.

The Company is a developer, manufacturer and marketer of medical devices, including products that focus on the treatment of cardiac arrhythmia and heart failure. Docket # 3 at ¶ 41. Certain of the Company's products are styled "Cardiac Rhythm Management" (CRM) products. Id. at ¶ 2. Most of the Company's CRM products (approximately 70% since 2006) are implantable cardiac defibrillator (ICD) systems, used to detect and treat abnormally fast heart rhythms (tachycardia). Id. at ¶ 41.

The Company entered the CRM market primarily via its 2006 acquisition of Guidant Corp. Id. A confidential witness in a related Securities Fraud Action who is a former Company CRM sales executive stated that the Company began auditing CRM sales expense reports in August 2009.[1] Id. at ¶ 58. The audit focused upon food and entertainment expenses associated with trips during which the sales representatives accompanied doctors to Company manufacturing facilities in California, Minnesota, and Puerto Rico. Id. On September 25, 2009, the Company received a subpoena from the U.S. Department of Health and Human Services, Office of Inspector General ("HHS's OIG"), requesting certain information relating to contributions made by its CRM sales force to charities with ties to physicians or their families. Id. at ¶ 63. The Company reported this subpoena in Third Quarter 2009 Form 10-Q, filed with the SEC, but did not disclose therein that the Company had previously performed an audit and interviewed a significant portion of its CRM sales force about possible improper entertainment and meals provided to physicians. Id.

---

[1] In keeping with the standard applicable to motions brought pursuant to Fed.R.Civ.P. 12, the Court recites the allegations of the Amended Complaint as if true.

On November 6, 2009, the Company issued a press release stating that it had reached an agreement in principle with the U.S. Department of Justice (DOJ) related to product advisories issued by Guidant prior to Guidant's acquisition by the Company. Id. at ¶ 66. Under the terms of the agreement, Guidant would plead to two misdemeanor charges related to failure to include information in reports to the U.S. Food and Drug Administration (FDA), and the Company would pay $296 million on behalf of Guidant. Id. On December 23, 2009, BSC issued a press release announcing that it had entered into a civil settlement agreement with DOJ regarding DOJ'S "investigation relating to certain post-market surveys conducted by Guidant Corporation before Boston Scientific acquired Guidant in 2006." Id. at ¶ 69. The Company agreed to pay $22 million as part of the settlement. It also agreed to enter into a corporate integrity agreement ("CIA") with the HHS's OIG. Id. Both of these investigations began in 2005, prior to Guidant's acquisition by the Company. The Amended Complaint is devoid of allegations that the settlements encompassed post-acquisition conduct or that the misconduct alleged continued after the acquisition of Guidant by the Company.

In late November 2009, the Company began terminating approximately ten members of its CRM sales force. Id. at ¶ 67. On February 10, 2010, the Company issued a press release entitled "Boston Scientific Announces Results for Fourth Quarter and Year Ended December 31, 2009" (the "February 10, 2010, financial results press release"), which did not disclose the fact that U.S. CRM group sales declined by $34 million in the fourth quarter of 2009, from $434 million to $418 million, and that worldwide sales had declined by $1 million; worldwide CRM sales, excluding Electrophysiology, declined from $646 million in the third quarter of 2009 to $607 million in the fourth quarter of 2009. Id. at ¶¶ 70, 72. Also on February 10, 2010, the

Company issued a second press release announc[ing] a series of management changes and restructuring initiatives. Id. at ¶ 74.

On February 11, 2010, Defendants Elliott, Leno and Capello, inter alia, participated in a conference call with investors and analysts to discuss the previous day's press releases. Id. at ¶ 75. Defendant Elliot reported therein that "[w]e exited from our company several sales representatives and managers who among other things repeatedly breached our healthcare professional Code of Conduct . . . we have invested extensively in building our HCP program under our new Chief Compliance Officer, Jean Lance. We have strengthened our internal policy and act[ed] aggressively to [e]nsure ourselves [that] all of our customers facing employees comply with those policies" Id. Elliott noted that a main competitor, who "may allow for a more relaxed viewpoint towards HCP" (i.e., health care professional) "relationships" had hired some of the terminated sales force and "[i]n the short haul, we will for certain lose sales, but I believe in the long haul we will be held in high regard by those that count for our efforts in the healthcare professionals arena. Others may not be so fortunate." Id.

Defendant Capello noted that the disciplinary measures taken within the CRM sales team at the end of 2009 would have a negative effect on U.S. CRM sales during 2010, but that "[t]hese actions were necessary to insure that we realized our longer term sales potential of the CRM business." Id. at ¶ 76. He noted as well that the CRM discipline, combined with a December 1, 2009, product advisory concerning a particular product defect (see infra), "could result in as much as $100 million less in sales in 2010, resulting in lower year-over-year growth rates." Id. The Company did not reveal, what the Amended Complaint alleges, specifically "that the Company's sales growth in CRM products during the Relevant Period was spurred by unethical

practices by its CRM sales force." Id. at ¶ 79. In its 2009 10-K statement, signed by the

Directors, the Company stated that "[n]et sales from our CRM group represent a significant

source of our overall net sales. Therefore, increases or decreases in our CRM group net sales

could have a significant impact on our results of operations. Recent disciplinary actions we have

taken against certain of our U.S. CRM sales personnel could result in lost U.S. CRM net sales in

the short term. We believe that with sustained targeted investments we can continue to grow our

worldwide CRM business." Id. at ¶ 81. Plaintiffs contrast this statement with Defendant Elliot's

statement on the conference call that "we will for certain lose sales." Id. at ¶ 82.

On February 10, 2010, the Company issued a press release concerning possible defects in

one of its products. Id. at ¶ 84. The release, entitled "Boston Scientific Rebuts HeartRhythm

Article," addressed concerns that the COGNIS CRT-D system had delivered unnecessary shocks

to a patient who had the device implanted subpectorally. Id. The article in question claimed that

a weakened "header bond" in the product caused the problem. Id. The Company's press release

said that "while the bond between the header and the case was weakened, the device functioned

normally and a weakened header bond was not the cause of the abnormal sensing

and pacing impedance observed in this patient." Id. During the February 11, 2011, conference

call, see supra, Defendant Elliott both denied any problem caused by the weakened bond and

also indicated that the bond was nevertheless being strengthened and would be out to customers

within the next month. Id. at ¶ 85. A similar statement appeared in the press release. Id. at ¶ 86.

On March 15, 2010, the Company announced in a press release that "it has stopped

shipment and is retrieving field inventory of all its implantable cardioverter defibrillators

(ICDs) and cardiac resynchronization therapy defibrillators (CRT-Ds)" because the Company

"determined that some manufacturing process changes were not submitted for approval to the [FDA]." Id. at 88. The press release noted that "[g]iven the financial uncertainty involved, these actions could have a material impact on the Company's previously issued guidance, including revenue, operating profit and cash flows for the first quarter and full year of 2010." Id. The Company's shares dropped 12.6%. Id. A report in the press on March 30, 2010, cited a memorandum sent by Company General Counsel Timothy Pratt to certain employees stating that DOJ and the SEC were "requesting information" regarding the recall. Id. at ¶ 90. The article stated that the memorandum indicated that DOJ had sent the Company a subpoena, and the SEC had begun an informal inquiry. Id.

The Defendants move to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), asserting that the Amended Complaint fails to state a claim upon which relief may be granted because (1) the Plaintiff has admittedly failed to make a pre-suit demand upon the Company's Board of Directors asking the Company itself to bring the claims advanced in the Amended Complaint, and (2) the Plaintiff has also failed to plead particularized facts sufficient to establish (under the applicable Delaware law and Fed. R. Civ. P. 23.1) that he was excused from making such a pre-suit demand because it would have been futile. Docket # 8.

Alternatively, the Defendants argue that the Plaintiff has failed to adequately plead valid causes of action against any of the individual defendants. Id.

II.    DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, — U.S. —, 129 S.Ct. 1937, 1949 (2009)(quoting Bell Atl. Corp. v. Twombly, 550 U.S.

544, 570 (2007)).  The court "must accept all well-pleaded facts alleged in the Complaint as true

and draw all reasonable inferences in favor of the plaintiff." Watterson v. Page, 987 F.2d 1, 3

(1st Cir.1993).  This "highly deferential" standard of review "does not mean, however, that a

court must (or should) accept every allegation made by the complainant, no matter how

conclusory or generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir.1992).

Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual

allegations, either direct or inferential, respecting each material element necessary to sustain

recovery under some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st

Cir.1997)(quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir.1988) (internal

quotation marks omitted). The tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions. Iqbal, 129 S.Ct. at 1949.

Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice.  Id.  The Court's assessment of the pleadings is "context-specific,"

requiring "the reviewing court to draw on its judicial experience and common sense."

Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir.2009)(quoting Iqbal, 129 S.Ct. at 1949).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to

relief." Id.

      The Derivative Action

      The derivative form of action permits an individual shareholder such as Barrington to

bring "suit to enforce a corporate cause of action against officers, directors, and third parties."

Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96 (1991) (quoting Ross v. Bernhard, 396 U.S.

531, 534 (1970)). Equity courts, seeking to prevent abuse of this remedy, established as a precondition for the suit that the shareholder demonstrate "that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." Id. at 97 (quoting Ross, 396 U.S. at 534)).

The requirement of "demand, unless excused" is accommodated by Fed. R. Civ. P. 23.1, which "applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a). It requires, inter alia, that the Complaint state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). This requirement, vigorously enforced in the First Circuit, is a deliberate departure from the relaxed policy of notice pleading promoted elsewhere in the Federal Rules and places an initial burden on the stockholder to demonstrate why the directors are incapable of doing their duty, and a failure to meet this burden requires dismissal of the suit. Heit v. Baird, 567 F.2d 1157 (1st Cir.1977); See also, Gonzalez Turul v. Rogatol Distributors, Inc., 951 F.2d 1, 2 (1st Cir.1991); In re Kauffman Mut. Fund Actions, 479 F.2d 257, 263 (1st Cir.1973) ( "to be allowed, sua sponte, to place himself in charge without first affording the directors the opportunity to occupy their normal status, a stockholder must show that his case is exceptional").

Rule 23.1 speaks to the adequacy of the pleadings and does not itself create a demand requirement of any particular dimension -- rather, the substantive requirements of demand are a

8

matter of state law. Kamen, 500 U.S. at 96, 108-09. A court applying the so-called "demand futility exception" in a derivative action must apply the exception as it is defined by the state of incorporation, in this case Delaware.[2] Id., at 108-09.

Under Delaware law, as a prerequisite to bringing a derivative suit, a shareholder must demonstrate that the board wrongfully refused to act on behalf of the corporation or that a demand on the board to do so would have been futile. See Risberg v. Aspen Tech, Inc. v. McArdle, 529 F.Supp.2d 213, 219 (D.Mass.2008) (Stearns, J.) (citing White v. Panic, 783 A.2d 543, 550 (Del.2001).[3] Because Barrington challenges not a specific board decision, but rather "more general board action or lack of action," the relevant inquiry is what has come to be known under Delaware law as the Rales test: that is, whether the Complaint sets out particularized facts creating a "reasonable doubt" that, at the time the Complaint was filed, a majority of a board of directors could have exercised independent and disinterested business judgment in responding to a litigation demand. Id. (citing Rales v. Blasband, 634 A.2d 927, 934 (Del.1993). Thus, Barrington's pleadings, to withstand a motion to dismiss, must set out particularized facts creating a reasonable doubt as to the ability of at least six of the Company's twelve directors to exercise independent and disinterested business judgment in responding to a litigation demand. See Docket # 3 at ¶¶ 9,20, 126 (the Company had twelve directors).

Reasonable doubt for demand futility purposes is to be evaluated on a case-by-case basis,

---

[2] See Docket # 3 at ¶ 8.

[3] In contrast, Massachusetts does not permit a shareholder bringing a derivative suit to plead futility -- rather, a demand must be made prior to suit. M.G.L. c. 156D, § 7.42 ("demand must be made prior to the commencement of every derivative case, whether or not the directors are independent with respect to the matter subject to the demand").

employing objective criteria, and not by "rote and inelastic" criteria. Grobow v. Perot, 539 A.2d
180, 186 (Del.1988). Disinterested "means that directors can neither appear on both sides of a
transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing,
as opposed to a benefit which devolves upon the corporation or all stockholders generally."
Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984). "Independence means that a director's
decision is based on the corporate merits of the subject before the board rather than extraneous
considerations or influences." Id. at 816. Reasonable doubt as to the ability of directors to
exercise independent and disinterested business judgment in responding to a litigation demand
can be established if the Complaint's particularlized allegations raise a substantial likelihood of
personal liability by a majority of the board. Rales, 634 A.2d at 936-37.

Demand is not excused solely because the directors would be deciding to sue themselves.
In re Citigroup Inc. Shareholder Derivative Litigation, 964 A.2d 106, 121 (Del.Ch.,2009). With
regard to director liability standards, Delaware law distinguishes between (1) "a board decision
that results in a loss because that decision was ill advised or 'negligent' " and (2) "an
unconsidered failure of the board to act in circumstances in which due attention would, arguably,
have prevented the loss." In re Caremark Intern. Inc. Derivative Litigation, 698 A.2d 959, 967
(Del.Ch.1996) (emphasis added).

In the former class of cases, director action is analyzed under the business judgment rule,
which prevents judicial second guessing of the decision if the directors employed a rational
process and considered all material information reasonably available – a standard measured by

concepts of gross negligence. Id. at 967.[4]

In the latter class of cases (where directors are alleged to be liable for a failure to monitor liability creating activities), "only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." Id. at 971. To establish oversight liability, a plaintiff must show that the directors knew they were not discharging their fiduciary obligations or that the directors demonstrated a conscious disregard for their responsibilities such as by failing to act in the face of a known duty to act. Guttman v. Huang, 823 A.2d 492, 506 (Del.Ch.2003) (citing Caremark, 698 A.2d at 971. A showing of bad faith is a necessary condition to director liability based upon a lack of oversight. Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 369 (Del.2009).

    The Sufficiency of the Allegations of the Amended Complaint With Regard To Futility

The Amended Complaint includes a section entitled, "Demand is Futile." Docket # 3 at ¶¶ 106 ff. Barrington admits therein that he has not made a demand on the Board of Directors to bring this suit, and asserts that such a demand would be futile. Id. at ¶ 109. A majority of the Board members, he alleges "have specific personal conflicts of interest or have demonstrated their individual inability to act independently and impartially." Id.

    Defendant Elliott

Barrington essentially incorporates by reference the Complaint in a Securities Fraud

_____

    [4] Barrington asserts that he primarily (although not exclusively) brings this type of allegation – i.e., that he alleges that the Defendants were aware of materially misleading statements and omissions and intentionally or recklessly chose not to take action to prevent or correct them. Docket # 11 at 24 n. 11 (citing Docket # 3 at ¶¶ 131-37).

Action pending in this District (In re Boston Scientific Corp. Securities Litigation, 10-cv-10593-DPW), which he states "contains actionable, detailed allegations of scienter, including allegations of actual knowledge of disloyal misconduct by Individual Defendant Elliott." Id. at ¶ 110. Barrington then asserts that "[t]here is no reasonable possibility [Elliott] can be expected to exercise impartial business judgment as to whether to pursue claims against himself in this matter, as such a decision will increase his risk of liability in the Securities Fraud Action." Id. He likewise asserts that "[b]ecause Individual Defendant Elliott derives substantial compensation from his position as an Executive Officer of BSC, he is incapable of making a disinterested decision as to whether to initiate suit on behalf of the Company." Id. at 111.

These allegations against Defendant Elliott suffice under Delaware law to adequately plead particularized facts creating a reasonable doubt as his ability to exercise independent and disinterested business judgment in responding to a litigation demand.

On the one hand, whether the conclusory assertion that the derivative suit would expose Elliot to a substantial likelihood of liability in the securities class action sufficiently calls into question Elliot's independence and disinterestedness to satisfy the demand futility requirement is unclear. See, e.g., Kernaghan v. Franklin, 2008 WL 4450268 (S.D.N.Y.2008) (applying Delaware law) (citing Rattner v. Bidzos, 2003 WL 22284323 (Del.Ch.2003) ("The only particularized facts . . . regarding the federal securities class action lawsuits are that such suits were filed and are pending . . . These conclusory and cryptic allegations are insufficient to satisfy the demand excusal requirements")). Barrington has left it to the Court to divine in what manner the derivative suit (which includes no allegations concerning Elliott beyond those in the securities class action) would expose Elliott to liability in the other case. It is not clear to the

12

Court how the mere repetition of the class allegations in a second case (even if Barrington would

be permitted to incorporate same by reference) necessarily increases the defendant's exposure in

the original case or that Plaintiff has established here that Elliott faces a substantial likelihood of

liability in the original case.

On the other hand, however, the allegations concerning Elliot's compensation are

adequate under Delaware law to establish that he is not disinterested. See, e.g., In re Veeco

Instruments, Inc. Securities Litigation, 434 F.Supp.2d 267, 275 (S.D.N.Y.2006) (applying

Delaware law) (fact of director's deriving his principal income from employment by the

corporation makes it improbable that he could perform his fiduciary duties without bring

influenced by his overriding personal interest) (citing In re General Motors (Hughes) S'holder

Litig., 2005 WL 1089021, *8 (Del.Ch. May 4, 2005)).[5]

### Defendants Byrne, Mario and Reinhardt, Sununu, Fox and Connors

With respect to Defendants Byrnes, Mario, and Reinhardt, Barrington alleges that they

were members of the Company's Audit Committee during the Relevant Period and that as such,

they:

> were responsible for "assisting the Board's oversight of the quality and integrity of
> the Company's financial reporting process, financial statements and related
> disclosure." The Audit Committee members were required to, among other things,
> "review and discuss the annual audited financial statements and quarterly financial
> statements with management and the independent auditor, including the Company's
> disclosures under "Management's Discussion and Analysis of Financial Condition

---

[5] The Defendants cite to Beam ex rel. Martha Stewart Living Omnimedia, Inc. v.
Stewart, 833 A.2d 961, 978 n. 55 (Del.Ch.,2003) (allegations regarding inside director's
compensation did "not call into question [his] disinterest with respect to demand). The Court did
find in that case, however, that the director's independence from another director (who was
herself interested in the subject matter of the Complaint) was called into question by the
magnitude of her compensation. The Beam Defendants had not contested disinterestedness.

and Results of Operations," before the filing of the Company's reports on Form 10-K and Form 10-Q;" and "discuss generally the type of information to be disclosed, and the type of presentation to be made, in earnings press releases . . . as well as the type of information to be disclosed, and the type of presentation to be made, in any financial information and earnings guidance provided to analysts and rating agencies."

Docket # 3, at ¶ 112.

Barrington alleges that Defendants Byrnes, Mario, and Reinhardt had access to adverse non-public information about the financial condition and operations of the Company, and "drafted, produced, reviewed, and/or disseminated" specified false and misleading statements" or that they "were aware, or should have been aware, or recklessly disregarded, that material false and misleading statements were being issued regarding the Company." Id., at ¶ 113.

Alternatively, he alleges that if current director Defendants Byrnes, Mario, and Reinhardt did not have access to adverse non-public information about the Company, then they failed to implement and oversee in good faith adequate internal controls sufficient to monitor and prevent other from disseminating false and misleading statements and information. Id. at ¶ 114. Barrington alleges the same failures by these defendants with regard to the Company's "violating or acting in contravention to, applicable legal requirements and Company policy." Id. at ¶¶ 115-116. The failure of the Audit Committee member Defendants to perform their duties in good faith, he alleges, "raises a substantial likelihood of non-exculpated personal liability on their part. As a result, they cannot impartially consider a demand on the Board to commence litigation against themselves." Id. at ¶ 118.

Bennington further alleges that Defendants Connors, Fox, Mario, Reinhardt, and Sununu were members of the Compliance and Quality (QC) Committee during the Relevant Period. Id. at ¶ 119. As such, they were: "responsible for overseeing and evaluating: "(I) the Company's

compliance and quality control systems and initiatives; (ii) the systems in place to maintain, and

identify deviations from, the Company's compliance and quality control standards; and (iii) the

Company's efforts to meet or exceed its compliance and quality control standards." Id.

Bennington makes allegations concerning CQ Committee Members' access to adverse non-

public information and knowing (or reckless) dissemination of false and misleading statements

or information mirroring those made with regard to the Audit Committee. Id. at ¶¶ 120-125.

　　　　The fact that directors would be asked to sue themselves does not itself establish that

demand is futile. Aronson, 473 A.2d at 817-18. Mere membership on the Audit or QC

Committees, or the recitation that the defendants were members of a committee responsible for

reviewing press releases, financial disclosures, etc., are likewise insufficient as a matter of law to

establish a substantial likelihood of liability, at least in the absence of particularized allegations

regarding the nature of the  non-public information Barrington believes would subject these

defendants to a substantial likelihood of liability. See, e.g., Pirelli Armstrong Tire Corp. Retiree

Med. Benefits Trust v. Lundgren, 579 F. Supp. 2d 520, 532-33 (S.D.N.Y. 2008) (applying

Delaware law). The Defendants assert that Barrington's allegations fail on this basis.

　　　　Barrington responds that Delaware law, contrary to the Defendants' assertion, does not

prohibit pleading directors' knowledge and liability inferentially, and that the instant case is one

in which the allegations of the Amended Complaint "evidence misconduct of such pervasiveness

and magnitude, undertaken in the face of the board's own express formal undertakings to directly

monitor and prevent such misconduct, that the inference of deliberate disregard by each and

every member of the board is entirely reasonable." Docket # 11 at 26-27 (quoting In re Pfizer

Inc. S'holder Deriv. Litig., 722 F. Supp.2d 453, 462 (S.D.N.Y.2010) (applying Delaware law).

In that case, the Complaint detailed "at great length" reports made to members of the board (including reports to the board of settlement of related litigation, violation notices and warning letters from a government agency, reports to Company compliance personnel of illegal activities and the allegations of qui tam lawsuits). See also In re Abbot Labs Deriv. S'holder Ligit., 325 F.3d. 795 (7th Cir.2003) (Applying Illinois law, which replicates the Delaware standards, and finding that six years of noncompliance, warning letters, and notice in the press, resulting in largest civil fine ever imposed by the FDA indicate directors decision not to act was not made in good faith).

The Amended Complaint, however, does not allege present conduct of a pervasiveness and magnitude comparable to that presented in the Abbot Labs and Pfizer cases relied upon by Barrington, such as would permit Barrington to plead sufficient knowledge and liability inferentially.  In Abbott, over a six-year period, the Food and Drug Administration had conducted thirteen separate inspections of Abbott's facilities, some lasting for two months or longer, and had sent four certified Warning Letters to the company detailing problems with the company's quality assurance procedures.  Abbott, 325 F.3d at 799.  The Company and the FDA had entered into a Voluntary Compliance Plan after the second Warning Letter , yet failed to meet its commitments thereunder and received additional FDA Warning Letters as a result.  Id. at 800.  Abbott and the FDA subsequently entered into a consent decree imposing a $100 million fine and prohibiting the manufacture of certain devices until FDA inspectors deemed two facilities to be in conformity with applicable regulations.  Id. at 801.  Abbott was also required to destroy existing inventory, foregoing approximately $250 million in annual revenue.  Id.  The Abbott Plaintiffs alleged direct knowledge of the directors of known violations through the

16

Warning Letters (as well as membership on the Audit Committee) and that the directors

knowingly chose not to address the FDA problems in a timely manner. Id. at 806.

In Pfizer, the Court recited allegations from the Complaint that the Board was aware that

its subsidiaries had engaged in illegal practices (prior to Pfizer's acquisition of them) which led

to settlements in which Pfizer paid very substantial fines (including civil penalties of $34.6

million, $49 million, and $190 million fine as well as a $240 million criminal fine) and entered

into Corporate Integrity Agreements requiring the Pfizer board, inter alia, to create and

implement compliance mechanisms to bring information about illegal marketing activities to the

attention of the board. Pfizer, 722 F.Supp.2d at 455-456. The Court further recited that despite

all these prior violations by its subsequently-acquired subsidiaries, and despite its promises to

take specific steps to monitor and prevent future violations, Pfizer itself engaged in the same

misconduct, and "kept careful track of how well their illegal activities were proceeding" and the

board retaliated against employees who reported internally that Pfizer's marketing practices were

illegal. Id. at 456. In a 2009 settlement with the FDA in which it admitted illegal marketing of

multiple drugs and suffered a criminal fine of $1.195 billion (the largest criminal fine ever

imposed in the United States), criminal forfeitures of $105 million; and a $1 billion civil

settlement (the largest civil fraud settlement against a pharmaceutical company). Id. at 457.

In contrast, the Amended Complaint at hand does not allege the pervasive misconduct

and disregard of regulatory requirements that was present in the Abbott and Pfizer cases. The

alleged responses of the Board to the misconduct of the Company's sales representatives, to the

product defects, and to the regulatory actions taken with regard to the pre-acquisition actions of

Guidant -- although insufficient to prevent financial loss to the Company -- appear reasonably

calculated to protect the interests of the Company. With regard to the misconduct of the CRM

sales force, for example, there are no particularized allegations that any of the directors were

aware of the misconduct prior to the investigation described. Rather, the Company appears to

have made reasonable efforts to eliminate those engaging in misconduct and to limit the financial

impact to the company, meanwhile making the required disclosures to regulators and investors.

Barrington's assertion that the admission that the terminations would result in reduced sales

constitutes an admission that sales figures were knowingly inflated by active concealment of the

misconduct is unwarranted on the facts alleged. Similarly, the actions alleged with regard to the

handling of defective products are reasonable responses to the situations presented. The press

release concerning the journal article takes a position apparently designed to limit the financial

impact of the required disclosures and remediation, and none of the statements attributed to the

Company in the Amended Complaint are demonstrably knowing misrepresentations. Finally, the

allegations concerning the Company's handling of issues arising from Guidant's pre-acquisition

misconduct similarly reveal not a pervasive course of misconduct in the face of regulatory

action, but rather a reasonable response to such action. In stark contrast to Pfizer, the Amended

Complaint makes no allegation that the pre-acquisition conduct continued or that the Company

itself engaged in such conduct.

The Court likewise does not find persuasive Barrington's arguments that all of the

directors face a substantial likelihood of personal liability on the bases of (1) their each having

signed the Company's 2003 Form 10K stating that the sales force dismissals "could" hurt CRM

sales when the statement was false or misleading in light of the fact that in the conference call,

one of the directors said the Company would "for sure lose sales" (Docket # 3 at ¶¶ 127-130); (2)

18

the systematic and widespread breakdown and gaps in the Company's financial reporting (Id. at

¶ 128); or the existence of the 2009 CIA, which demonstrates that the directors failed in their

duties "because the government has compelled them to perform their fiduciary duties" (Id. at ¶

129).

   The first statements are not even necessarily contradictory or misleading, as the loss of

individual sales does not necessarily foretell a decrease in total annual sales.  Even accepting that

the statement could be seen as misleading, it does not create a substantial likelihood of personal

liability.  See, e.g., Seminaris v. Landa, 662 A.2d 1350, 1354 (Del.Ch.1995) (signing a

misleading 10–K and a misleading registration statement does not alone create a substantial

likelihood of director liability).  As to the second asserted basis, the Court (as noted supra) is not

persuaded that the facts alleged suggest pervasive widespread systematic problems such as

would permit the conclusion that the allegedly pervasive misconduct itself creates a substantial

likelihood of personal liability, to relieve Barrington from his burden of pre-suit demand.

Finally, a CIA entered into by the Company concerning the pre-acquisition conduct of its

subsidiary hardly demonstrates a failure on the part of the Company's directors.

### Sufficiency of Pleading

   Alternatively, the Defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on the

grounds that each of the claims advanced by Barrington fails to state a claim upon which relief

may be granted.  The Court need not reach this issue in the event that it adopts the undersigned's

recommendation with regard to demand futility.  In the event that the Court finds that the

Plaintiff's Amended Complaint survives the Defendants Rule 23.1 challenge, it may yet be

unnecessary to reach this issue, because the Rule 12(b)(6) standard is less stringent than the Rule

19

23.1 standard, and a complaint that survives a Rule 23.1 challenge will also survive a 12(b)(6)

motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim.

See Pfizer, 722 F.Supp2d at 462 (citing McPadden v. Sidhu, 964 A.2d 1262, 1270

(Del.Ch.2008)).  In the event that the Court's findings on the Rule 23.1 issue rest upon grounds

other than those implicated by the Rule 12(b)(6) motion, then, if the Court requests, the

undersigned will provide a supplementary Report and Recommendation addressing those issues.

III.    CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court ALLOW the Defendants'

Motion to Dismiss the Amended Complaint (Docket # 8).[6]  For the reasons cited within the

Defendants' memorandum (Docket # 9 at 34-35), I also recommend that the dismissal be with

prejudice.


                                    /s / Leo T. Sorokin
                                    UNITED STATES MAGISTRATE JUDGE

---

[6] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).